*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2013 UT 32**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

R. SCOTT REYNOLDS, an individual,
*Plaintiff and Appellant*,
*v.*
JEFFREY G. BICKEL, an individual and
TANNER L.C., a limited liability company,
*Defendants and Appellees.*

JEFFREY G. BICKEL, an individual and
TANNER L.C., a Utah limited liability company,
*Third-Party Plaintiffs,*
*v.*
ALTAVIEW CONCRETE, L.L.C., a Utah limited liability company,
*Third-Party Defendant.*

No. 20120396
Filed June 4, 2013

Third District, Salt Lake Dep't
The Honorable Robert P. Faust
No. 110904057

Attorneys:

R. L. Knuth, J. Angus Edwards, Salt Lake City,
for appellant

George W. Burbidge II, Geoffrey C. Haslam, Tyler V. Snow,
Salt Lake City, for appellees

JUSTICE DURHAM authored the opinion of the Court in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE NEHRING,
JUSTICE PARRISH, and JUSTICE LEE joined.

JUSTICE DURHAM, opinion of the Court:

## INTRODUCTION

¶1     Plaintiff Scott Reynolds appeals the district court's grant of
summary judgment for Tanner L.C. and Jeffrey Bickel (Defendants).
The district court held that Defendants are not liable to Mr. Reynolds
because they did not "identif[y] in writing to the[ir] client that the
professional services performed on behalf of the client were

intended to be relied upon by" Mr. Reynolds, as required by Utah Code section 58-26a-602(2)(b). We reverse.

## BACKGROUND

¶2    In July 2010, Scott Reynolds was negotiating the sale of three limited liability companies of which he was the sole shareholder (collectively, Altaview Companies or Companies). The Altaview Companies were S corporations under 26 U.S.C. 1362(a), meaning that the Companies themselves paid no income taxes. Instead, Mr. Reynolds reported the Companies' income on his individual tax return. The tax liability from the sale of the Altaview Companies' assets[1] would accordingly fall not on the Companies themselves, but on Mr. Reynolds. Concerned about his personal tax liability from the contemplated sale, Mr. Reynolds retained the accounting firm Tanner L.C. The retention agreement, which was prepared by Jeffrey Bickel, a partner at Tanner L.C., named "Altaview Concrete" as the client. Altaview Concrete is one of the three Altaview Companies. Mr. Reynolds signed on behalf of Altaview Concrete.

¶3    During July, August, and September of 2010, Defendants advised Mr. Reynolds and the Altaview Companies' in-house accountant, Ben Covington, on Mr. Reynolds's tax liability from the sale. Mr. Reynolds intended to proceed with the sale only if his net proceeds exceeded a certain amount. Based on the buyer's initial proposed terms, Mr. Covington and Mr. Bickel estimated Mr. Reynolds's tax liability to be between $1,500,000 and $2,000,000. This was unacceptable to Mr. Reynolds, so Mr. Bickel advised Mr. Covington on how to restructure the deal to reduce Mr. Reynolds's tax liability to $663,000. Mr. Bickel discussed these restructuring proposals with the buyer's chief financial officer, and the buyer ultimately agreed to them. The sale closed on September 15, 2010.

¶4    Several weeks after the sale closed, Mr. Bickel informed Mr. Covington that "we may have inadvertently excluded from Scott's proceeds the distribution of the installment note, which potentially changes the tax quite a bit." Defendants had underestimated Mr. Reynolds's tax liability by $1,513,641. After Defendants refused Mr. Reynolds's request for reimbursement of the additional $1,513,641, Mr. Reynolds filed a professional negligence claim in district court.

---

[1] The sale appears to have been structured as a sale of all of the Companies' assets, rather than as a stock sale.

¶5 Defendants admitted in their Answer that they "knew that a primary reason that Altaview entered into the [retention] Agreement was to provide tax and transactional services which would benefit Reynolds by minimizing his tax liability from the sale." Nevertheless, Defendants moved for summary judgment, arguing that Mr. Reynolds's claim was barred by Utah Code section 58-26a-602 (Section 602), which states that accountants are not liable to third parties (absent fraud or intentional misrepresentation) unless (a) the accountant "knew that a primary intent of the client" was for the services to benefit the third party and (b) the accountant "identified in writing to the client that the professional services . . . were intended to be relied upon by the" third party. Defendants asserted that the writing requirement of Section 602(2)(b) was not satisfied.

¶6 Before ruling on the summary judgment motion, the district court asked Mr. Reynolds to submit documents that he contended satisfied the writing requirement. After reviewing these documents, the district court granted Defendants' motion for summary judgment, holding that "[t]here is no writing which me[e]ts with Section 58-26-602." Mr. Reynolds appealed to this court. We have jurisdiction pursuant to Utah Code section 78A-3-102(3)(j).

## STANDARD OF REVIEW

¶7 Whether a motion for summary judgment was properly granted is a question of law, which we review for correctness. *Basic Research, LLC v. Admiral Ins. Co.*, 2013 UT 6, ¶ 5, 297 P.3d 578.

## ANALYSIS

¶8 Mr. Reynolds concedes that he is not in privity with Defendants,[2] and accordingly he cannot bring a professional negligence claim against Defendants unless he comes within one of Section 602's exceptions. Because he does not allege fraud or intentional misrepresentation, the only exception available to him is that of subsection (2). The first prong of subsection (2) is satisfied by Defendants' concession that they knew their client, Altaview Concrete, intended that Mr. Reynolds rely on their professional services. Thus, the only questions on appeal are (1) whether the writing requirement of subsection (2)(b) applies to Mr. Reynolds and

---

[2] Had Mr. Reynolds not made this concession, we would consider whether the actions of Mr. Reynolds and Defendants amounted to a relationship of accountant and client notwithstanding the fact that the retention agreement did not name Mr. Reynolds as a client.

(2) if so, whether the requirement was satisfied by the documents Mr. Reynolds presented to the district court. We answer both questions in the affirmative and accordingly reverse the district court's grant of summary judgment.

## I. THE WRITING REQUIREMENT OF SECTION 602(2)(b) APPLIES TO MR. REYNOLDS

¶9 Mr. Reynolds contends that the writing requirement of Section 602 does not apply to him because Defendants knew their client intended for Mr. Reynolds to rely on their advice. Citing legislative history of Section 602 and caselaw interpreting similar statutes from other states, Mr. Reynolds argues that requiring an accountant to provide a client with "[w]ritten acknowledgement of [the] client's own undisputed intentions . . . is a meaningless exercise that the law does not require." We disagree with Mr. Reynolds's interpretation of Section 602.

¶10 "When interpreting statutory language, our primary objective is to ascertain the intent of the legislature." *Ivory Homes, Ltd. v. Utah State Tax Comm'n*, 2011 UT 54, ¶ 21, 266 P.3d 751. "The best evidence of the legislature's intent is the plain language of the statute itself." *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 14, 267 P.3d 863 (internal quotation marks omitted). We resort to legislative history and other interpretive tools only if the statute's plain meaning cannot be discerned from its text. *Id.* ¶ 15.

¶11 Here, the contours of the statute are clear. Section 602 provides in full:

> A licensee, a CPA firm registered under this chapter, and any employee, partner, member, officer, or shareholder of a licensee or CPA firm are not liable to persons with whom they are not in privity of contract for civil damages resulting from acts, omissions, decisions, or other conduct in connection with professional services performed by that person, except for:
>
> (1) acts, omissions, decisions, or conduct that constitute fraud or intentional misrepresentations; or
>
> (2) other acts, omissions, decisions, or conduct, if the person performing the professional services:
>
> > (a) knew that a primary intent of the client was for the professional services to benefit or

influence the particular person seeking to establish liability; and

(b) identified in writing to the client that the professional services performed on behalf of the client were intended to be relied upon by the particular person seeking to establish liability.

The statutory language unambiguously sets forth a default rule with two exceptions: Accountants "are not liable to persons with whom they are not in privity of contract . . . except for" (1) cases of fraud or intentional misrepresentation or (2) cases where the accountant (a) knew the client intended the third party to rely *and* (b) the accountant "identified in writing to the client" an intent that the plaintiff rely. Because the requirements under subsection (2) are conjunctive, both the knowledge requirement of subsection (2)(a) and the writing requirement of subsection (2)(b) must be fulfilled before liability can run to a third party under this exception. We have no need to consider legislative history or other interpretive resources because the language is entirely clear on this point.

¶12    We next examine the writings that Mr. Reynolds presented to the district court to determine whether they satisfied the writing requirement of subsection (2)(b).

## II. THE DOCUMENTS MR. REYNOLDS PRESENTED TO THE DISTRICT COURT SATISFIED THE WRITING REQUIREMENT

¶13    Mr. Reynolds presented the court with twenty-five e-mails and eleven spreadsheets in satisfaction of the writing requirement of Section 602(2)(b). Most of the e-mail exchanges were between Mr. Bickel and Mr. Covington (the Altaview Companies' in-house accountant) and focused on Mr. Reynolds's potential tax liability from the sale. On July 14, Mr. Covington e-mailed several spreadsheets to Mr. Bickel and asked him to "review [them] . . . and provide feedback." The spreadsheets estimated Mr. Reynolds's tax liability from the sale under various assumptions. Each spreadsheet mentioned Mr. Reynolds by name five times. On July 16, Mr. Bickel replied to Mr. Covington, applauding him for having "done a tremendous job on these calculations" and posing follow-up questions. On July 26, Mr. Covington answered the questions and asked Mr. Bickel to review additional spreadsheets involving Mr. Reynolds's tax liability.

¶14　On August 5, Mr. Covington e-mailed Mr. Bickel with two specific questions:

> Scott will be responsible for paying income tax on any income for the companies year to date up to the date of the closing. The Companies will file a final return and the income to that point will be attributable to his personal return? / If that is the case I should include the income as an addition to his basis in his stock, assuming the taxes will be paid from the proceeds of the closing?

Mr. Bickel responded, "You are correct on both points." Over the next week, Mr. Covington, Mr. Bickel, and Mr. Reynolds's attorney exchanged several e-mails regarding the buyer's proposed allocation of the purchase price to various assets. They discussed strategies for reallocating the purchase price to reduce Mr. Reynolds's tax liability.

¶15　Section 602(2)(b) is satisfied if the accountant has "identified in writing to the client that the professional services performed on behalf of the client were intended to be relied upon by the particular person seeking to establish liability." Defendants contend that these writings are insufficient because no single writing explicitly states that "the [Defendants] intended for Reynolds to rely on the work that the [Defendants] were performing."[3] However, subsection (2)(b) does not require an explicit statement in a single writing; it requires an "identifi[cation] in writing" that a third party is intended to rely on the accountant's services.

¶16　Because of the similarities between Section 602 and the statute of frauds, we find appellate opinions interpreting the writing requirement of the statute of frauds to be instructive. Like Section 602, the statute of frauds employs the phrase "in writing." UTAH CODE § 25-5-1, et. seq. Further, the statute of frauds has a signature requirement that is analogous to Section 602's requirement that the writing be authored by the accountant. *See id.* These requirements

---

[3] Defendants seem to concede that the communications addressed to Mr. Covington were effectively directed "to the client," and we agree that by operation of agency law, communications to Mr. Covington, an officer and agent of Altaview Concrete, are properly deemed communications to Altaview Concrete. *See Wardley Better Homes & Gardens v. Cannon*, 2002 UT 99, ¶ 22, 61 P.3d 1009 (stating that knowledge of a corporate officer or agent "can always be imputed to a corporation . . . because a corporation has no belief or intent independent of that of its officers and agents").

both have the purpose of ensuring that the party to be bound has made written acknowledgment of its legal obligations.

¶17    In the statute of frauds context, "[o]ne or more writings, not all of which are signed by the party to be charged, may be considered together as a memorandum . . . if there is a nexus between them." *Machan Hampshire Props., Inc. v. W. Real Estate & Dev. Co.*, 779 P.2d 230, 234 (Utah Ct. App. 1989) (citing *Gregerson v. Jensen*, 617 P.2d 369, 373 (Utah 1980)). By analogy, we hold that for purposes of Section 602(2)(b), one or more writings, not all of which are *authored* by the party to be charged, may be considered together as a memorandum if there is a nexus between them.

¶18    A nexus for statute of frauds purposes is indicated "by express reference in the signed writing to the unsigned one, or by implied reference glea[n]ed from the contents of the writings and the circumstances surrounding the transaction." *Gregerson*, 617 P.2d at 373. By analogy, we hold that for purposes of Section 602(2)(b), a nexus may be indicated by express reference in a writing *authored by the defendant* to other writings, or by implied reference gleaned from the contents of the writings and the circumstances surrounding the transaction.

¶19    Here, several e-mails written by Defendant Jeffrey Bickel expressly referenced other e-mails and spreadsheets prepared by Mr. Covington and others. For example, on July 14, Mr. Bickel wrote to Mr. Covington that he would look over the spreadsheets Mr. Covington had prepared relating to Mr. Reynolds's tax liability. Two days later, Mr. Bickel gave Mr. Covington written feedback on the spreadsheets and posed follow-up questions. On August 5, Mr. Bickel responded directly to Mr. Covington's questions relating to Mr. Reynolds's tax liability. On August 10, in response to a group e-mail from an attorney about the tax implications for Mr. Reynolds of the buyer's purchase price allocation proposal, Mr. Bickel wrote, "I am in agreement with [the attorney's] comments."

¶20    Additionally, all of the e-mails and spreadsheets, with the exception of two e-mails between Mr. Covington and the buyer, manifest an "implied reference" to one another, based on "the contents of the writings and the circumstances surrounding the transaction." *Gregerson*, 6l7 P.2d at 373. The common theme of the e-mail and spreadsheets are the tax implications for Mr. Reynolds of the sale of the Altaview Companies. Indeed, these writings all reflect what Defendants have admitted was the purpose of their retention: to minimize Mr. Reynolds's personal tax liability from the sale of the Altaview Companies.

¶21 Defendants knew that the Altaview Companies were S corporations under 26 U.S.C. 1362(a) and that Mr. Reynolds was the only person or entity who could benefit from Mr. Bickel's advice. Thus, when Mr. Bickel exchanged e-mails with Mr. Covington regarding the tax consequences of the sale for Mr. Reynolds, he was impliedly communicating "that [his] professional services . . . were intended to be relied upon by" Mr. Reynolds. UTAH CODE § 58-26a-602(2)(b).

¶22 Although the statute does not specify whether "intended" refers to the client or the accountant, that ambiguity is immaterial here because the writings clearly evince intent on the part of both the client and the accountant. The questions posed by the Altaview Companies through their officers show that they sought tax advice for the benefit of Mr. Reynolds. The writings also show that the Defendants intended Mr. Reynolds's reliance. Black's Law Dictionary defines "intend" as "[t]o contemplate that the usual consequences of one's act will probably or necessarily follow from the act, whether or not those consequences are desired for their own sake." BLACK'S LAW DICTIONARY 881 (9th ed. 2009). Accordingly, to the extent subsection (2)(b) requires a statement of the accountant's intent, written acknowledgment that a third party will likely rely on the accountant's services is sufficient.

¶23 For three months, Defendants provided ongoing tax advice, knowing all along that no one besides Mr. Reynolds could benefit from the advice. Indeed, Defendants admit they "knew that a primary reason that Altaview entered into the [retention] Agreement was to provide tax and transactional services which would benefit Reynolds by minimizing his tax liability from the sale." Defendants argue only that they did not communicate in writing their intent for Mr. Reynolds to rely. We disagree. The writings presented to the district court plainly show that Defendants contemplated that, as the natural consequence of their providing advice regarding Mr. Reynolds's tax liability, Mr. Reynolds would rely on the advice. Accordingly, both prongs of the exception found in Section 602(2) are satisfied, and Mr. Reynolds may proceed in his professional negligence action against Defendants.

## CONCLUSION

¶24 We hold that Defendants are liable to Mr. Reynolds as a third party under Section 602 because (1) they "knew that a primary intent of the client" was for Mr. Reynolds to rely on their services and (2) they "identified in writing . . . that the professional services . . . were intended to be relied upon by" Mr. Reynolds. We therefore

reverse the district court's grant of summary judgment and direct that Mr. Reynolds be allowed to proceed with his claims against Defendants.

——————