**2017 UT App 25**

## THE UTAH COURT OF APPEALS

REPEREX INC., BRAD BALL, AND DAVID BALL,
Appellants,
*v.*
CHILD, VAN WAGONER & BRADSHAW; J. RUSSTON BRADSHAW;
COLDWELL BANKER COMMERCIAL; AND DUANE BUSH,
Appellees.

Opinion
No. 20150246-CA
Filed February 9, 2017

Third District Court, Salt Lake Department
The Honorable Todd M. Shaughnessy
No. 110916924

J. Spencer Ball, Attorney for Appellants

Tyler S. Foutz, Attorney for Appellees Child, Van
Wagoner & Bradshaw and J. Russton Bradshaw

Shane W. Norris, Attorney for Appellees Coldwell
Banker Commerical and Duane Bush

JUDGE J. FREDERIC VOROS JR. authored this Opinion, in which
JUDGES GREGORY K. ORME and MICHELE M. CHRISTIANSEN
concurred.

VOROS, Judge:

¶1　Reperex Inc., Brad Ball, and David Ball (collectively, the Buyers) purchased a business with the help of business brokerage Coldwell Banker Commercial and its agent Duane Bush (collectively, the Broker). Accountant J. Russton Bradshaw and his firm Child, Van Wagoner & Bradshaw (collectively, the Accountant) provided the Buyers with financial information about the business. The business ultimately failed. The Buyers claimed that the Broker and the Accountant had misrepresented the financial strength of the business and sued both for fraud,

negligent misrepresentation, and breach of fiduciary duty. The district court dismissed all claims against the Broker and the claims of negligent misrepresentation and breach of fiduciary duty against the Accountant. The remaining fraud claim against the Accountant went to trial, and the jury returned a verdict in favor of the Accountant. The Buyers appeal.

¶2     We affirm the dismissal of the Buyers' claims against the Accountant and the trial verdict in favor of the Accountant. We vacate the dismissal of the Buyers' claims against the Broker and remand the case for further proceedings.

BACKGROUND[1]

¶3     In July 2008 the Buyers contacted the Broker, expressing interest in acquiring a new business. The Broker introduced the Buyers to May's Custom Tile (the Business). The Business had an agreement with the Broker to "find buyers" and to "arrange and negotiate the sale, merger, lease, or trade [of] . . . the assets of the Company." The Buyers met with the Broker and the owner of the Business, Steve May (the Seller), several times to discuss purchasing the Business. The Broker told the Buyers that he would represent both the Buyers and the Seller in a "dual agency capacity."

¶4     The Seller had originally hired the Accountant to prepare tax returns for the Business. When the Seller decided to sell the Business in 2008, he asked the Accountant to provide financial

---

1. When reviewing a district court's rulings on both a motion for judgment on the pleadings and a summary judgment motion, we recite the facts and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, here the Buyers. *See Poteet v. White*, 2006 UT 63, ¶ 7, 147 P.3d 439 (summary judgment motion); *Pierucci v. U.S. Bank, NA*, 2015 UT App 80, ¶ 8, 347 P.3d 837 (motion for judgment on the pleadings).

records and tax returns to an unrelated potential buyer (the Potential Buyer). The Accountant provided the requested documents to the Potential Buyer and answered his questions, which were relayed to him by email through the Broker. After the Potential Buyer learned that the Business's largest client (comprising a significant share of its 2007 sales) had filed for bankruptcy, he opted not to purchase the Business.

¶5      When the Buyers later expressed interest in the Business, the Seller asked the Accountant to provide the Broker with "similar documents" to those he had earlier provided to the Potential Buyer. Because of the confidential nature of the client list and other documents, the Seller was reluctant to hand over copies of the Business's records and other financial documents, but he agreed to let the Buyers review the records at the Accountant's office in a due diligence meeting.

¶6      The Buyers met with the Accountant, the Broker, and the Seller to conduct the due diligence meeting. The meeting lasted two hours or less; the Seller paid the Accountant for his time. The meeting was the only direct interaction between the Accountant and the Buyers. While the parties disagree about what occurred at the meeting, it is undisputed that the parties were all present and that the Buyers reviewed many of the Business's financial records—including tax returns and other financial statements compiled by the Accountant.

¶7      After examining the business records provided by the Accountant, the Buyers purchased the Business. In connection with the purchase, the Buyers signed a broker agreement for sale of assets that included a non-reliance clause, limiting the liability of the Broker:

> Buyer hereby acknowledges that Buyer is relying on its own inspection of the involved business and the representations of the Seller and not of [the Broker] and/or any of its agents or employees with regards to the prior operating history of the business, the value of the assets being purchased

and all other material facts of Seller in completing the transaction as evidenced by the Agreement for Purchase and Sale together with its attachments. Buyer further acknowledges that neither [the Broker] nor any of its agents and/or employees have verified the representations of the Seller, and should any representations be untrue, Buyer agrees to look solely to Seller for relief and to indemnify [the Broker], its agents and employees and hold them harmless in connection with all losses and damages caused to Buyer thereby.

¶8     After the Buyers purchased the Business, they learned that the Business was "not as advertised." The Broker had given the Buyers financial statements showing that the 2006 profits totaled over $300,000. The Broker did not tell the Buyers that the Accountant had sent him an email indicating that, in reality, the Business had made just over $74,000 in 2006.

¶9     The Buyers had also specifically asked the Broker about whether the Seller had commingled funds between the Business and another business he owned. The Broker responded that the Broker could not list or market a company for sale if there was any commingling. However, the Accountant had told the Broker that his firm had "not clean[ed] up" the Business's 2006 financials. The Accountant had earlier told the Broker by email, "The sales are OK. But the expenses are a bit shaky. . . . Keep in mind there was a lot of intercompany commingling between [the Business] and [the Seller's other business]." The Broker also knew, but did not inform the Buyers, that one of the Business's largest clients, a real estate developer called Promontory, had filed for bankruptcy. Promontory accounted for a significant share of the Business's profits the previous year. Indeed, Promontory's bankruptcy was the very reason the Potential Buyer lost interest in the Business.

¶10    The Buyers had also asked the Broker about the licensing requirements necessary to run the Business. The Broker informed the Buyers that they could get a contractor's license in

90 days; in reality, the Buyers needed three years to qualify for the license.

¶11 The Buyers sued the Broker for fraud, negligent misrepresentation, and breach of fiduciary duty. The Broker moved for judgment on the pleadings, arguing that the non-reliance clause in the broker agreement barred the Buyers' claims. The district court granted judgment on the pleadings on the claims of fraud and negligent misrepresentation, but not on the claim of breach of fiduciary duty. The Broker then filed a motion for summary judgment on the breach of fiduciary duty claim. The Broker argued that summary judgment was proper because the Buyers had failed to designate an expert witness to establish the elements of their breach of fiduciary duty claim. The district court granted the Broker summary judgment against the Buyers on that basis.

¶12 The Buyers also sued the Accountant for fraud, negligent misrepresentation, and breach of fiduciary duty. The Accountant moved for summary judgment. The Accountant argued, among other things, that the Buyers were not in privity of contract with the Accountant, that they had not satisfied any exceptions to the requirement of privity, and thus that their claims are barred. The district court granted summary judgment on the claims of negligent misrepresentation and breach of fiduciary duty. The court held a four-day jury trial on the remaining fraud claim. The Buyers requested a jury instruction on fraudulent nondisclosure, which included the element of duty. The district court denied the requested instruction, ruling that its previous grant of summary judgment in favor of the Accountant as to the negligence claim (with duty as one of the four elements) precluded a conclusion that the Accountant owed a duty that would support a claim of fraudulent nondisclosure. The jury returned a verdict in favor of the Accountant on the fraud claim.

¶13 The Buyers appeal the dismissal of their claims against the Broker and the dismissal of their claims of negligent misrepresentation and breach of fiduciary duty against the Accountant. They also appeal the district court's refusal to

include a jury instruction for fraudulent nondisclosure on the fraud claim against the Accountant.

ISSUES ON APPEAL

¶14    First, the Buyers contend that the district court erred in dismissing their claims of fraud and negligent misrepresentation against the Broker based on the non-reliance clause in the broker agreement.

¶15    Second, the Buyers contend that the district court erred in granting summary judgment in favor of the Broker on the Buyers' breach of fiduciary duty claim on the ground that the Buyers had not designated an expert witness.

¶16    Third, the Buyers contend that the district court erred in granting summary judgment in favor of the Accountant on their claims of negligent misrepresentation and breach of fiduciary duty.

¶17    Finally, the Buyers contend that the district court erred in refusing to instruct the jury on fraudulent concealment and fraudulent nondisclosure.

ANALYSIS

I. Non-Reliance Clause

¶18    The Buyers contend that the district court erred when it granted the Broker's motion for judgment on the pleadings. "The grant of a motion for judgment on the pleadings is reviewed under the same standard as the grant of a motion to dismiss, i.e., we affirm the grant of such a motion only if, as a matter of law, the plaintiff could not recover under the facts alleged." *Estrada v. Mendoza*, 2012 UT App 82, ¶ 2, 275 P.3d 1024 (citation and internal quotation marks omitted). "The grant of a motion to dismiss is thus a matter of law, which we review for

correctness." *Thimmes v. Utah State Univ.*, 2001 UT App 93, ¶ 4, 22 P.3d 257 (citation and internal quotation marks omitted).

¶19    The district court dismissed the Buyers' claims of fraud and negligent misrepresentation against the Broker. The court concluded that the "underlying facts" of the Buyers' claims were "essentially identical to those in *Ruf, Inc. v. Icelandic Investments, Inc.*," 1999 UT App 103U. In *Ruf*, this court stated that "[t]o prove fraud or negligent misrepresentation, appellants must show, among other things, that they reasonably relied on the false or misleading representation." *Id.* para. 2. We concluded that appellants could not show that they had relied on false or misleading representations because "appellants signed an agreement expressly stating that appellants would not and could not rely on any representation made by broker," and that this non-reliance clause "precludes appellants from contending that they relied on any representation made by broker." *Id.* (footnote omitted).

¶20    Relying on *Ruf*, the district court concluded that the Buyers as "the purchaser[s] of a business could not, as a matter of law, rely on statements made by a broker in the face of [a] . . . non-reliance clause." The court also noted that the non-reliance clause in *Ruf* was virtually identical to the clause in the agreement the Buyers had signed. "Thus," the court reasoned, "based on the logic and reasoning of *Ruf*, [the Buyers'] claims for fraud and negligent misrepresentation fail as a matter of law."

¶21    The Buyers contend that *Ruf* is no longer good law. They further argue that the clause in their agreement with the Broker is distinguishable from the clause at issue in *Ruf*.

¶22    "A release is a type of contract and may generally be enforced or rescinded on the same grounds as other contracts." *Horgan v. Industrial Design Corp.*, 657 P.2d 751, 753 (Utah 1982). "[A] contract clause limiting liability will not be applied in a fraud action. The law does not permit a covenant of immunity which will protect a person against his own fraud on the ground of public policy. A contract limitation on damages or remedies is

valid only in the absence of allegations or proof of fraud." *Lamb v. Bangart*, 525 P.2d 602, 608 (Utah 1974). "'If a party's manifestation of assent is induced by either a fraudulent or a material representation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient.'" *Miller v. Celebration Mining Co.*, 2001 UT 64, ¶ 10, 29 P.3d 1231 (quoting Restatement (Second) of Contracts § 164(1) (Am. Law Inst. 1981)). "Accordingly, a release will be voidable if it was an integral part of a scheme to defraud." *Ong Int'l (USA) Inc. v. 11th Avenue Corp.*, 850 P.2d 447, 453 (Utah 1993).

¶23    "To successfully establish fraud, appellants must state with particularity facts establishing that a sufficient causal connection exists between [a defendant's] alleged fraud and the procurement of the release in [an] agreement." *Otsuka Electronics (USA, Inc.) v. Imaging Specialists, Inc.*, 937 P.2d 1274, 1280 (Utah Ct. App. 1997). "One of the elements of fraud that a plaintiff must prove is that he or she, acting reasonably and in ignorance of the statement's falsity, did in fact rely upon the misrepresentation." *Robinson v. Tripco Inv., Inc.*, 2000 UT App 200, ¶ 19, 21 P.3d 219 (citations and internal quotation marks omitted). "To determine whether the reliance was reasonable, the reliance must be considered with reference to the facts of each case." *Id.* ¶ 20 (citation and internal quotation marks omitted). "[A] plaintiff may justifiably rely on positive assertions of fact without independent investigation. It is only where, under the circumstances, the facts should make it apparent to one of his knowledge and intelligence, or he has discovered something which should serve as a warning that he is being deceived, that a plaintiff is required to make his own investigation." *Id.* (citation and internal quotation marks omitted).

¶24    The district court concluded that the "underlying facts" of the Buyers' claims were "essentially identical to those in *Ruf.*" The language of the release of liability in *Ruf* does closely track the language of the release included in the Buyers' agreement of sale with the Broker. *See Ruf*, 1999 UT App 103U, para. 2. Both

releases "contractually define[] roles, identif[y] the source of any representations, highlight[] the obligation of the buyer to verify information, and preclude[] reliance on any representation made by broker"—all characteristics that the *Ruf* court used to distinguish the *Ruf* release from other releases that "broadly limit[] liability." *Id.* para. 2 n.1.

¶25 *Ruf* distinguished another case, *Ong*, on the ground that the release at issue there "broadly limit[ed] liability." *Id.* para. 2 n.1 (citing *Ong*, 850 P.2d at 453). But as the authorities cited above make clear, the distinction is not between broad provisions and specific ones, but between provisions that are procured by fraud or integral to a scheme to defraud and those that are not.

¶26 Moreover, in the provision at issue here, the Broker represented "that neither [the Broker] nor any of its agents and/or employees have verified the representations of the Seller." But the Buyers allege that this representation by the Broker is false—that the Broker did in fact attempt to verify certain representations of the Seller and found them to be false. As the Buyers argue, this provision "does not at all contemplate that the broker would fraudulently filter the information" and then provide facts "which the broker knew were plainly false by reason of the reports and documents they filtered out."

¶27 We understand how *Ruf* may reasonably be read as filling an interstice in Utah fraud jurisprudence. But we do not read *Ruf* as embedding any new rule into the law of fraud in Utah. *Ruf* was an unpublished memorandum decision.[2] "A memorandum

---

2. The court no longer designates opinions or memorandum decisions as "for official publication" or "not for official publication," leaving the decision of which memorandum decisions and opinions warrant publication to the marketplace. Memorandum decisions of the Utah Court of Appeals are now published routinely by West Publishing, LexisNexis, and others.

decision may not be used to render a decision in any matter not clearly and unequivocally disposed of on the basis of well-established Utah case law or Utah statute." *Grand County v. Rogers*, 2002 UT 25, ¶ 14, 44 P.3d 734. Unpublished memorandum decisions are not used to announce a legal rule that is "new, or novel, or has not previously been applied to a matter of the type on appeal." *Id.* They are intended to "add nothing to the body of the law." *Id.* ¶ 17. Of course, "in those rare instances when some new legal rule is inadvertently announced by way of a memorandum decision, authorizing citation to that decision will assure consistency in the law." *Id.* But the fact that no appellate court has cited *Ruf* in 18 years reinforces our conclusion that it did not alter the law of fraud in Utah. In any event, to the extent *Ruf* would dictate a different result than would the general rules applied by our supreme court in *Lamb*, *Miller*, and *Ong*, we disavow it.

¶28    Whether the Buyers' claim prevails in the face of the non-reliance clause depends not on the breadth of the clause as suggested by *Ruf*, but on allegations or proof of fraud, including whether the clause was procured by fraud or integral to a scheme to defraud. *See Lamb*, 525 P.2d at 608; *Ong*, 850 P.2d at 453. Viewing the Buyers' alleged facts and all reasonable inferences from them in favor of the Buyers, we conclude that those facts, if proven, could reasonably support a finding that the non-reliance provision satisfied this standard. We therefore conclude that the district court incorrectly granted the Broker's motion for judgment on the pleadings. Accordingly, we vacate the dismissal of the Buyers' fraud claims against the Broker. *See Thimmes v. Utah State Univ.*, 2001 UT App 93, ¶ 4, 22 P.3d 257.

## II. Expert Witness

¶29    The Buyers contend that the district court erred in granting summary judgment in favor of the Broker on their claim of breach of fiduciary duty. They argue that they "do not need an expert witness to prove broker fraud to a jury."

¶30    The Broker responds that the district court "correctly dismissed [the Buyers'] final cause of action for breach of fiduciary duty because [the Buyers] could not satisfy the requisite elements of the cause of action without the testimony of an expert witness." Expert testimony was necessary, the Broker argues, to "establish the appropriate standard of care for, and duties owed by, a reasonable mergers and acquisitions agent or business broker" and to determine whether the Broker's actions fell below that standard.

¶31    The Buyers alleged in their complaint that the Broker had a fiduciary duty to the Buyers as their real estate agent to represent them in their purchase of the Business and their option to purchase a different business. Further, they alleged that the Broker breached that fiduciary duty by failing to make several disclosures to the Buyers: (1) the bankruptcy of Promontory, a customer that accounted for a significant share of the Business's revenue; (2) the need to have a contractor's license; (3) the delinquency of accounts; and (4) the existence of substantial bad debt held by the Business. In fact, the Buyers allege, when they inquired if the Business had any bad debt, they were told the Business had no significant bad debt at all.

¶32    The district court ruled that the Buyers "must have expert testimony to establish the standard of care to be applied to [the Broker] under the facts of the case and to assist a jury in determining whether [the Broker's] conduct satisfied the applicable standard." The court ruled on summary judgment that it was not "within the knowledge of the average person what particular duties and responsibilities a business broker would owe in connection with transmitting information to a prospective buyer," and consequently that the Buyers needed "expert testimony to establish that standard of care." Because the Buyers had not designated an expert witness, the court ruled that the Buyers' breach of fiduciary duty claim failed "as a matter of law."

¶33    "An appellate court reviews a [district] court's legal conclusions and ultimate grant or denial of summary judgment

for correctness, and views the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600 (citations and internal quotation marks omitted).

¶34   "To prove a breach of fiduciary duty claim, a plaintiff must demonstrate that the defendant owed a duty, the defendant breached the duty, the plaintiff suffered damages, and the plaintiff's damages were actually and proximately caused by the defendant's breach." *Giles v. Mineral Resources Int'l, Inc.*, 2014 UT App 259, ¶ 6, 338 P.3d 825. "Utah courts have held that expert testimony may be helpful, and in some cases necessary, in establishing the standard of care required in cases dealing with the duties owed by a particular profession." *Preston & Chambers, P.C. v. Koller*, 943 P.2d 260, 263 (Utah Ct. App. 1997). Specifically, "[e]xpert testimony is required [w]here the average person has little understanding of the duties owed by particular trades or professions . . . ." *Id.* (second alteration in original) (citation and internal quotation marks omitted). But "expert testimony may be unnecessary where the propriety of the defendant's conduct 'is within the common knowledge and experience'" of a layperson. *Id.* at 263–64 (quoting *Nixdorf v. Hicken*, 612 P.2d 348, 352 (Utah 1980)).

A.   Duty

¶35   The parties' briefs discuss whether the Broker owed a fiduciary duty to the Buyers. But in his deposition, Duane Bush acknowledged that he had a fiduciary duty to the Buyers. Furthermore, the Offer of Purchase and Sale of Assets Agreement, which is signed by the Broker, stated that "both Listing agent and Selling agent represent the Seller *and buyer*." (The emphasized words are hand-written.) Regarding the existence of a duty, the district court observed that the Buyers had argued that "we don't have to deal with the . . . question," because the Broker "admitted that there was a . . . duty owing." The court later asked the Broker, "just assume that a fiduciary duty does exist between the broker [and the Buyers]; does that

change the landscape?" The Broker's counsel responded, "No, not in this case; not at all. His testimony was he had a duty to both sides, and he did. If he knew that there was a misrepresentation being made, certainly he would have a duty to tell the other side."

¶36   The court concluded that the issue before it was to determine the applicable "standard of care that a business broker would have as opposed to the existence of a duty." No party has appealed this ruling of the district court. Accordingly, we do not address the question of whether the Broker owed the Buyers a duty here. We assume that it did.

B.     Standard of Care

¶37   The Buyers contend that expert testimony was not necessary for a jury to determine whether the Broker's actions breached the fiduciary duty it owed to the Buyers. The Broker responds that expert testimony was necessary to aid the jury "because Buyers could not satisfy the requisite elements of the cause of action without the testimony of an expert witness."

¶38   The district court ruled that expert testimony was necessary and granted summary judgment to the Broker because the Buyers lacked an expert witness. The court reasoned that an expert was necessary to establish the standard of care a business broker would owe in connection with analyzing or transmitting information to a prospective buyer of a business because that knowledge was not within the common knowledge of the average person:

> I don't think that it is within the knowledge of the average person what particular duties and responsibilities a business broker would owe in connection with transmitting information to a prospective buyer, and the extent to which a broker would be obligated to potentially employ . . . leagues of experts in various disciplines to be able to analyze the data that's being provided

in order to . . . understand it, and then be able to know whether they have an obligation to relay the information.

¶39   In *Hermansen v. Tasulis*, 2002 UT 52, 48 P.3d 235, our supreme court held that a real estate broker has a duty to be "honest, ethical, and competent" and to "deal fairly and honestly, despite the fact that the broker is acting primarily as the seller's agent." *Id.* ¶¶ 20, 22 (citation and internal quotation marks omitted). These duties required the broker "to disclose facts materially affecting the value or the desirability of the property that were known to him." *Id.* ¶ 20 (citation and internal quotation marks omitted). And in *Gilbert Development Corp. v. Wardley Corp.*, 2010 UT App 361, 246 P.3d 131, this court held that a real estate agent "could not misrepresent, either affirmatively or by omission," its client's "financial condition or ability to perform." *Id.* ¶ 24. The Broker does not challenge these standards or deny that they apply to a business broker as well as a real estate broker. In fact, in arguing that *Hermansen* and *Gilbert* did not overrule *Ruf, Inc. v. Icelandic Investments, Inc.*, 1999 UT App 103U, the Broker states, "Nothing in *Ruf* implied or stated that a *business broker* does not have a duty to the other side of a transaction to be 'honest, ethical or competent.'" (Emphasis added.)

¶40   Few Utah decisions deal with business brokers. Indeed, *Ruf* is the only one of which we are aware. But we agree with the apparent concession of the parties that, at least where, as here, the business being sold includes real property, the standard of care for business brokers is not lower than the standard of care for real estate brokers. Business brokers must deal fairly and honestly; be honest, ethical, and competent; and not misrepresent, either affirmatively or by omission, their client's financial condition or ability to perform. *See Hermansen*, 2002 UT 52, ¶¶ 20, 22; *Gilbert*, 2010 UT App 361, ¶ 24.

¶41   However, these cases do not obligate a seller's business broker, in the district court's words, "to potentially employ . . . leagues of experts in various disciplines to be able to

analyze the data that's being provided in order to . . . understand it, and then be able to know whether they have an obligation to relay the information." Absent expert testimony, the case law does not impose on business brokers an affirmative obligation to master the details of its client's business and communicate them to a potential buyer; but brokers must treat a potential buyer fairly and honestly with respect to the information they do know.

¶42     Thus, the question on appeal resolves to whether the present case is so factually complex that a jury of laypersons could not apply the foregoing standards.

C.     Complexity

¶43     Under Utah law, expert testimony may be necessary to "establish[] the standard of care required in cases dealing with the duties owed by a particular profession," especially where the average person has little understanding of the duties owed by a particular profession, or the case involves complex allegations. *Preston & Chambers, P.C. v. Koller*, 943 P.2d 260, 263 (Utah Ct. App. 1997). But "expert testimony may be unnecessary where the propriety of the defendant's conduct is within the common knowledge and experience" of the jury. *Id.* at 263–64 (citation and internal quotation marks omitted).

¶44     The central question on appeal is whether this case is one where expert testimony was necessary to explain the complicated duty and breach issues, or one where expert testimony was not necessary because the breach was within the "common knowledge and experience" of the jury. *Compare Posner v. Equity Title Ins. Agency, Inc.*, 2009 UT App 347, ¶¶ 21–22, 222 P.3d 775, *abrogated on other grounds by Coroles v. State*, 2015 UT 48, ¶ 23, 349 P.3d 739, *with White v. Jeppson*, 2014 UT App 90, ¶¶ 19–23, 325 P.3d 888.

¶45     The Broker asserts that *Posner* "is on all fours with this case and is dispositive." *See Posner*, 2009 UT App 347. In *Posner*, a property seller sued his real estate broker for breach of fiduciary

duty after the buyers failed to repay a seller-financed loan. *Id.* ¶¶ 2–7. The seller and broker negotiated a fairly complex sale that included partial seller financing, a surety bond, an out-of-state seller, and split closing dates. *See id.* ¶ 22. The district court granted summary judgment to the broker after the seller did not designate an expert to provide expert testimony regarding the duties involved in the sale. *Id.* ¶¶ 22, 28. We determined that a layperson could not readily have comprehended the broker's fiduciary duties "in this complex transaction," and thus agreed with the district court that expert testimony was necessary to prove the broker's alleged breach of those duties. *Id.* ¶ 22.

¶46 *Posner* discussed "factually distinguishable and unpersuasive" cases. *Id.* Among them was *Reese v. Harper*, 329 P.2d 410 (Utah 1958). *Reese* hinged on the fact that the agent had been employed by the seller to sell real estate for $45,000, approximately $15,000 of which would pay off encumbrances on the property, leaving the seller with a net profit of $30,000. *See id.* at 411. The agent in *Reese* presented the seller with an offer of $30,000 that appeared to have the buyer pay off the encumbrances, but which actually had the seller pay them off, thus bringing the seller's net sale total to approximately $15,000. *See id.* at 411–12. Because the agent failed to disclose this fact—a fact that decreased the seller's gain by roughly half—the *Reese* court affirmed the jury's determination that the agent had breached a fiduciary duty to seller. *See id.* at 413. This court concluded that the facts in *Reese* were "not as complex" as the facts in *Posner*, and in any event, the supreme court in *Reese* did not address the issue of when an expert witness is required. *Posner*, 2009 UT App 347, ¶ 22 n.7.

¶47 The Buyers rely on *White v. Jeppson*, 2014 UT App 90, 325 P.3d 888. In *White*, two plaintiffs enrolled in a financial education course and personal financial coaching lessons with the defendants "to learn how to manage money more effectively." *Id.* ¶ 2. The defendants soon began offering the plaintiffs various "investment opportunities." *Id.* In total, the plaintiffs agreed to invest in four deals negotiated by the defendants—at a net

economic loss to the plaintiffs. *Id.* ¶¶ 3–9. The district court ruled that the case involved "complex real estate investments that involved multiple parties and types of properties, and various financing arrangements spanning a period of several years," and dismissed plaintiffs' breach of fiduciary duty claim for failure to designate an expert. *Id.* ¶¶ 9, 21.

¶48    On appeal, this court reversed because the district court's "blanket approach" failed to "carefully analyze the need for expert testimony on a claim-by-claim, element-by-element basis . . . ." *Id.* ¶ 22. For one of the investments in particular, the plaintiffs claimed that the defendants breached their fiduciary duty by lying about their participation in the investment and having previously received "big checks" from the investment. *Id.* ¶ 23. We held that whether the promoter had "received 'big checks' from the investment is a clear example of where expert testimony is not needed." *Id.* Exaggerating the return on an investment, we observed, "is certainly 'within the common knowledge and experience'" of a jury. *Id.* (quoting *Nixdorf v. Hicken*, 612 P.2d 348, 352 (Utah 1980)).[3]

¶49    We conclude that the Buyers' claims here are not so complex as to require expert testimony. First, the Buyers allege that the Broker assured them that the Business's profits were $371,000, when in fact they were only $74,000. Second, the Buyers allege that the Broker assured them that it could not sell a business if there were any commingling of funds, when in fact the Accountant had specifically told the Broker that "there was a lot of intercompany commingling" between the Business and the Seller's other business. Third, the Buyers allege that the Broker

---

3. Although the *White* court deemed the "big checks" claim to be a clear example of where expert testimony is not needed, we remanded for the district court to analyze the need for expert testimony on each of the plaintiffs' remaining—and otherwise unarticulated—claims. *White v. Jeppson*, 2014 UT App 90, ¶¶ 23–24, 325 P.3d 888.

assured them that they would be able to secure the license needed to operate the Business in 90 days, when in fact it would take them at least three years. Finally, the Buyers allege that the Broker knew but failed to tell them that the Business's largest client had filed for bankruptcy. These claims are similar in complexity to the agent's misrepresentation in *Reese* and the broker's claims of "big checks" in *White*.

¶50   We recognize that the sale of an operating business may exceed in complexity many commercial real estate sales, most investments, and nearly all residential real estate sales. But, as we explained in *White*, the complexity of the claim, not the complexity of the transaction, determines whether expert testimony is required. And, because the Buyers' claims here resemble the plaintiffs' claims we analyzed in *White*, we conclude that the Buyers' claims here are "within the common knowledge and experience" of the jury. *See White*, 2014 UT App 90, ¶ 23 (citation and internal quotation marks omitted).

¶51   In sum, we conclude that the district court incorrectly ruled that expert testimony was necessary for the Buyers to prevail on their breach of fiduciary duty claim. We thus vacate the dismissal of the Buyers' breach of fiduciary duty claim against the Broker and remand the case to the district court.

## III. Accountant Liability

¶52   The Buyers contend that the district court erred in granting summary judgment in favor of the Accountant on their claims of negligent misrepresentation and breach of fiduciary duty. Specifically, the Buyers argue that an exception to Utah Code section 58-26a-602 (the Accountant Liability Statute) makes the Accountant liable to the Buyers.[4]

---

4. Although the Buyers contend that they "were in full privity of contract with [the Accountant] as a third party beneficiary," the Buyers fail to demonstrate any contractual agreement that

(continued…)

¶53 The Accountant responds that the district court properly granted summary judgment. The Accountant maintains that the Accountant Liability Statute shields him from liability because no contractual privity exists between himself and the Buyers and because the Buyers cannot meet the statute's exception requiring a "writing" between the Accountant and the Seller stating an intent for the Buyers to rely on his work. *See* Utah Code Ann. § 58-26a-602 (LexisNexis 2016).

¶54 The district court ruled that the Buyers had not satisfied the writing exception and thus granted summary judgment in favor of the Accountant on the Buyers' negligent misrepresentation and breach of fiduciary duty claims. Addressing contractual privity, the court determined, "It is undisputed that Defendants and Plaintiffs were not in privity of contract for the purpose of Defendants providing accounting services to Plaintiffs." Addressing the writing exception, the court concluded that it was undisputed that no writing existed from the Accountant to the Seller, to the Business, or to the Buyers that would satisfy the statute.

¶55 "An appellate court reviews a trial court's legal conclusions and ultimate grant or denial of summary judgment for correctness, and views the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving

---

(…continued)
actually created, as they argue, an "accountant-client relationship." Moreover, the Buyers fail to cite any relevant case law showing why—even if they were named third party beneficiaries—being a third party beneficiary, contrary to its usual connotation, satisfies the privity requirement in Utah Code section 58-26a-602. An inadequately briefed claim is by definition insufficient to discharge an appellant's burden to demonstrate trial court error. *See Salt Lake County v. Butler, Crockett & Walsh Dev. Corp.*, 2013 UT App 30, ¶ 37 n.5, 297 P.3d 38.

party." *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600 (citations and internal quotation marks omitted).

¶56 Utah's Certified Public Accountant Licensing Act regulates various aspects of the accounting profession. Utah Code Ann. § 58-26a-101. The Accountant Liability Statute states the general rule that licensed Utah accountants are not liable to those with whom they are not in privity of contract. *Id.* § 58-26a-602. But it also contains two exceptions, one for fraud and one for writings:

> A licensee, a CPA firm registered under this chapter, and any employee, partner, member, officer, or shareholder of a licensee or CPA firm are not liable to persons with whom they are not in privity of contract for civil damages resulting from acts, omissions, decisions, or other conduct in connection with professional services performed by that person, except for:
>
> (1) acts, omissions, decisions, or conduct that constitute fraud or intentional misrepresentations; or
>
> (2) other acts, omissions, decisions, or conduct, if the person performing the professional services:
>
>> (a) knew that a primary intent of the client was for the professional services to benefit or influence the particular person seeking to establish liability; and
>>
>> (b) identified in writing to the client that the professional services performed on behalf of the client were intended to be relied upon by the particular person seeking to establish liability.

*Id.* Our supreme court has explained that this "statutory language unambiguously sets forth a default rule with two exceptions: Accountants 'are not liable to persons with whom they are not in privity of contract . . . except for' (1) cases of fraud or intentional misrepresentations or (2) cases where the accountant (a) knew the client intended the third party to rely *and* (b) the accountant 'identified in writing to the client' an intent that the plaintiff rely." *Reynolds v. Bickel*, 2013 UT 32, ¶ 11, 307 P.3d 570 (quoting Utah Code Ann. § 58-26a-602).

¶57     In *Reynolds*, our supreme court provided guidance on the exception at issue. There, an accountant provided accounting services to three companies in preparation for their sale. *Id.* ¶ 2. The companies were owned by the seller, but the seller conceded that he was not in privity with the accountant. *Id.* ¶¶ 2, 8. However, over approximately three months, the accountant exchanged at least twenty-five emails and eleven spreadsheets with the companies' in-house accountant; most of these exchanges discussed strategies to decrease the seller's tax liability. *See id.* ¶¶ 3, 13. After the seller sold the companies, the parties discovered that the accountant had underestimated the seller's personal tax liability by approximately $1.5 million. *Id.* ¶ 4. The seller sued the accountant. *Id.*

¶58     The key question in *Reynolds* was whether the accountant could be liable to the seller under the Accountant Liability Statute. Because the seller conceded a lack of privity between himself and the accountant and fraud was not alleged, the appeal turned on the writing exception in subsection (2) of the statute. *See* Utah Code Ann. § 58-26a-602(2)(b). The seller "presented the court with twenty-five emails and eleven spreadsheets" which he contended satisfied the writing requirement of section 602(2)(b). *Reynolds*, 2013 UT 32, ¶ 13. The accountant responded that the emails and spreadsheets were insufficient "because no single writing explicitly state[d] that 'the [accountants] intended for [the seller] to rely on the work that [the accountants] were performing.'" *Id.* ¶ 15.

¶59 Our supreme court held that "one or more writings . . . may be considered together . . . if there is a nexus between them." *Id.* ¶ 17. The court next concluded that a nexus existed between the writings because they "expressly referenced" each other and manifested an "'implied reference' to one another . . . ." *Id.* ¶¶ 19–20. "The common theme of the e-mail and spreadsheets [was] the tax implications for [the seller] of the sale of the . . . Companies." *Id.* ¶ 20. The accountant knew that the seller "was the only person or entity who could benefit" from the accountant's advice. *Id.* ¶ 21. Thus, when the accountant exchanged emails with the companies' in-house accountant regarding the tax consequences of the sale for the seller, "he was impliedly communicating 'that [his] professional services . . . were intended to be relied upon by' [the seller]." *Id.* (first alteration and ellipsis in original) (quoting Utah Code Ann. § 58-26a-602(2)(b)).

¶60 The statute as interpreted by *Reynolds* controls here. The exception includes two elements. The first is that the person performing the professional services "knew that a primary intent of the client was for the professional services to benefit or influence the particular person seeking to establish liability." Utah Code Ann. § 58-26a-602(2)(a). The Accountant's participation in the due diligence meeting and his admission that he provided the Buyers with the same documents he had previously provided to the Potential Buyer may well satisfy this element.

¶61 The second element requires that the person performing the professional services "identified in writing to the client that the professional services performed on behalf of the client were intended to be relied upon by the particular person seeking to establish liability." *Id.* § 58-26a-602(2)(b). Here, the Accountant did not identify in one or a series of writings to the Seller that anyone intended the Buyers to rely on his services. Thus, the Buyers cannot satisfy the writing exception to the Accountant Liability Statute. *See id.* § 58-26a-602.

¶62    The Buyers argue that various emails between the Accountant and the Broker satisfy the writing requirement. But these emails never mention the Buyers. They name only the Potential Buyer; the Buyers have produced no email from the Accountant that even by implication identifies them. And the statutory requirement is precise: the writing must indicate an intent that the services be relied on by "the particular person seeking to establish liability"—here, the Buyers. *See id.*[5]

¶63    The Buyers further argue that the Accountant's delivery of various financial documents to the Buyers during the due diligence meeting should satisfy the writing requirement because the Accountant provided the Potential Buyer with the same documents, and the documents were discussed in emails mentioning the Potential Buyer. Again, the Accountant's delivery of documents to the Buyers during the due diligence meeting would likely satisfy the first prong of section 58-26a-602—the Accountant's knowledge that the Buyers were relying on his work—but the second requirement remains unsatisfied. Because none of the financial documents the Accountant gave to the Buyers at the due diligence meeting mentioned the Buyers, the writing exception does not apply. *See id.*[6]

---

5. *Reynolds v. Bickel* notes that "the statute does not specify whether 'intended' refers to the client or the accountant," but concludes that the "ambiguity is immaterial here because the writings clearly evince intent on the part of both the client and the accountant." 2013 UT 32, ¶ 22, 307 P.3d 570. The ambiguity is immaterial here also, but for the opposite reason: no writings evince intent on the part of either the Buyers or the Accountant.

6. We acknowledge that circumstantial evidence strongly indicates that the Seller, the Broker, and the Accountant all intended the Buyers to rely on the Accountant's services. This evidence would thus appear to satisfy the policy or intent of the writing exception. But "[o]ur task is to interpret the words used

(continued…)

¶64 Consequently, the district court correctly ruled that no writing satisfies the exception to the Accountant Liability Statute's privity requirement. We therefore affirm the summary judgment on the Buyers' remaining claims against the Accountant.

## IV. Jury Instruction on Fraudulent Nondisclosure

¶65 The Buyers contend that the district court erred in rejecting their proposed jury instruction on fraudulent nondisclosure.

¶66 The Accountant responds that the district court correctly declined to instruct the jury on fraudulent nondisclosure. The Accountant argues that "the finding of a duty or special relationship is a key element of fraudulent nondisclosure[,]" and the district court had already ruled that no duty existed between the Accountant and the Buyers under the Accountant Liability Statute. The Accountant also argues that the Buyers never alleged fraudulent nondisclosure as a cause of action and thus are not entitled to an instruction on that claim.

¶67 The district court rejected the Buyers' proposed instruction on the ground that the court had already "effectively . . . determined there was no duty" when it dismissed the Buyers' negligent misrepresentation claim at summary judgment.

---

(…continued)

by the legislature, not to correct or revise them. When the words are clear, however incongruous they may appear in policy application, we will interpret them as written, leaving to the legislature the task of making corrections when warranted." *State v. Wallace*, 2006 UT 86, ¶ 9, 150 P.3d 540. And with rare exception, our role requires us to apply the text of the statute, not its policy. *See Rothstein v. Snowbird Corp.*, 2007 UT 96, ¶ 10, 175 P.3d 560.

¶68   "Whether the trial court's refusal to give a proposed jury instruction constitutes error is a question of law, which we review for correctness." *State v. Hamilton*, 827 P.2d 232, 238 (Utah 1992). The determination of whether a legal duty exists "is a purely legal question," which we also review for correctness. *Yazd v. Woodside Homes Corp.*, 2006 UT 47, ¶ 14, 143 P.3d 283.

¶69   To prevail on a claim of fraudulent nondisclosure, a plaintiff must prove by clear and convincing evidence that (1) the defendant had a legal duty to communicate information, (2) the defendant knew of the information he failed to disclose, and (3) the undisclosed information was material. *Hess v. Canberra Dev. Co.*, 2011 UT 22, ¶ 29, 254 P.3d 161. As explained above, the district court correctly ruled that, under the Accountant Liability Statute, the Accountant owed no duty to the Buyers.

¶70   Here, the Buyers argue that the factual circumstances of this case—particularly the Accountant's role in the due diligence meeting—created a duty from the Accountant to the Buyers. The Buyers cite to *Yazd v. Woodside Homes*, which recognized that a duty between parties otherwise lacking privity may arise if a "special relationship exists." *See* 2006 UT 47, ¶ 18 (citations and internal quotation marks omitted).

¶71   "There are occasionally instances in which a court is called upon to make policy choices based on assessments of social, economic, and technological conditions," such as when "policy considerations bear on a subject lodged firmly within the court's sphere, like the common law . . . ." *Id.* ¶¶ 19–20. But for the accounting profession, the legislature has occupied the field. It has crafted a statute adopting the general rule that accountants owe no duty to those with whom they are not in privity and defining with considerable precision the exceptions to that general rule. *See* Utah Code Ann. § 58-26a-602 (LexisNexis 2016). Absent any constitutional concerns, which the Buyers do not assert, we are not at liberty to graft onto the statute an exception that our legislature chose not to include.

¶72     Because the court correctly concluded that the Accountant did not owe the Buyers a duty under the Accountant Liability Statute, it correctly refused to give the jury instruction on fraudulent nondisclosure. *See Hamilton*, 827 P.2d at 238. We thus affirm the district court's ruling on this point.

## CONCLUSION

¶73     For the foregoing reasons, we affirm the judgment with respect to the Buyers' claims against the Accountant, and we vacate the dismissal of the Buyers' claims against the Broker. We therefore remand the case for further proceedings.

————