MACHAN HAMPSHIRE PROPERTIES, INC., a Utah corporation, Plaintiff and Appellant,

v.

WESTERN REAL ESTATE & DEVELOPMENT COMPANY, a Utah corporation; Western Mortgage and Loan Corporation, a Utah corporation; K–E Enterprises, a Utah general partnership; Birtcher Investments, a California general partnership; Birtcher American Properties, a California association; and CapitalCorp Financial, Inc., a California corporation, Defendants and Respondents.

No. 880229–CA.

Court of Appeals of Utah.

Aug. 10, 1989.

law, we give no deference to the trial court's view of the law, but review it for correctness. *Ron Case Roofing & Asphalt Paving, Inc. v. Blomquist,* 773 P.2d 1382, 1385 (Utah 1989); *Madsen v. Borthick,* 769 P.2d 245, 247 (Utah 1988).

### FACTS

Western Mortgage and K–E Enterprises owned 16.6 acres of land in Roy, Utah, on which they developed the IOmega Light Industrial Park. In January 1985, Robert Polcha, a licensed real estate agent working for appellant Machan, took an airplane trip around the Salt Lake Valley with representatives from Birtcher Investments, pointing out properties available for purchase, not including IOmega Park. That same month, after being notified by a commercial loan officer at Western Mortgage that IOmega Park was for sale, Daum Corporation, a California real estate brokerage firm, contacted Richard Slavin, executive vice president of CapitalCorp Financial, Inc. ("CapCorp"), and solicited a written offer to purchase the industrial park, which was forwarded to the property owners on January 30. On February 5, 1985, the owners countered with a modified offer that was accepted by CapCorp three days later. Paragraph 9 of the purchase agreement provided for the property owners to pay a commission of 3% of the sales price to Daum Corporation. Closing was set for mid-April and later postponed until mid-July. Slavin immediately began discussions with the chief executive officer and the executive vice president of acquisitions of Birtcher Investments, with which CapCorp had a longstanding business relationship, about a possible joint venture in the purchase of IOmega Park.

Sometime in January or February, Polcha phoned Kelly Goddard, president of Western Development,[3] and inquired about properties being marketed by that compa-

Michael N. Emery, Salt Lake City, for plaintiff and appellant.

Dan S. Bushnell, David M. Wahlquist and Merrill F. Nelson, Salt Lake City, for defendants and respondents.

Before BILLINGS, JACKSON, and ORME, JJ.

JACKSON, Judge:

Machan Hampshire Properties, Inc. ("Machan"), a real estate brokerage, appeals from a summary judgment dismissing its contract claim against defendants Western Real Estate & Development Company ("Western Development"), Western Mortgage and Loan Corporation ("Western Mortgage"), and K–E Enterprises[1] for a real estate sales commission. The lower court ruled that Machan's claim was barred by the statute of frauds codified in Utah Code Ann. § 25–5–4(5) (1989).[2] We affirm.

In reviewing a summary judgment, we consider the evidence in the light most favorable to the losing party and affirm only where it appears there is no genuine dispute as to any material issue of fact, or where, even according to the facts as contended by the losing party, the moving party is entitled to judgment as a matter of law. *D & L Supply v. Saurini,* 775 P.2d 420, 421 (1989) (quoting *Themy v. Seagull Enters., Inc.,* 595 P.2d 526, 528–29 (Utah 1979)). In deciding whether the trial court properly granted judgment as a matter of

1. This appeal does not directly address the trial court's order disposing of appellant's claims against the other defendants.

2. Recent amendments to this provision, enacted by Utah Laws 1989, ch. 257, § 1, effective April 24, 1989, appear in the 1989 supplement.

3. At the time, Goddard was also a vice president of Western Mortgage and a general partner in K–E Enterprises.

ny. During the phone conversation, Goddard mentioned that IOmega Park was for sale. He also told Polcha it was Western Development's practice to keep a log of clients registered in letters from each broker, filing them by broker.[4] Polcha told Goddard on the telephone that he would register his clients in that manner, and Goddard agreed to let him do so.[5]

Following the phone call, Goddard sent Polcha a letter dated February 21, 1985, stating:

Re: IOmega Park
Roy, Utah

Dear Bob:

Enclosed, please find the information you requested on the above captioned project. As I indicated to you on the phone, we have accepted another offer, and should you have success in obtaining a buyer, be sure they understand it would be a back-up-offer.

If there are any questions you may have on the information, please contact me.

Very truly yours,
/s/
Kelly Goddard
President

Polcha then sent Goddard the following letter, dated February 26, 1985:

RE: REGISTRATION OF CLIENT FOR PROPERTY KNOWN AS IOMEGA PARK/ROY, UTAH

Dear Mr. Goddard:

Machan Hampshire Properties, Inc./Robert F. Polcha represents the following clients in connection with the proposed purchase of the subject properties. The purpose of this letter is to register the clients with you and to set forth our understanding that in the event a transaction is consummated between yourself and these clients, you agree to pay a commission to Machan Hampshire Properties, Inc./Robert F. Polcha. Said commission shall be four percent (4%) on IOmega Industrial Park.

CAL FED SYNDICATIONS
BIRTCHER AMERICAN PROPERTIES
EQUITABLE LIFE REAL ESTATE DIVISION

Very truly yours,
/s/
By: Robert F. Polcha

In a letter dated the next day to Andrew Trachman, a vice president at Birtcher, Polcha first presented IOmega Park as a property available for a back-up purchase offer and enclosed a packet of information about the property. He sent Trachman additional information about the property two months later.

During March, Polcha sent three more letters to Goddard, with wording identical to that in his February 26 letter, "registering" three additional clients. On April 12, 1985, Polcha sent another letter to Goddard, similar to that of February 26, but referring to a "proposed lease" of the subject property and naming Birtcher American Properties, Inc. and Equitable Life Real Estate as Machan's clients. Polcha sent another client registration letter to Goddard in late April and another in mid-July, both referring to a proposed sale of IOmega Park.

Conversations between Birtcher and CapCorp officials concerning a possible joint venture in, or direct purchase by Birtcher of CapCorp's rights as purchaser under, the February purchase agreement were held in June. Sometime in July 1985, Goddard phoned Polcha and indicated that the

---

4. Although it appears that this system was intended to prevent competing broker claims to a commission for sale to a client, we fail to see how a log indexed under the name of each broker could achieve this goal without another index of the registration letters by property parcel. Absent this second system, it would take a complete review of every letter concerning every client in the file of every broker each time it was necessary to discover which, if any, broker had first registered the ultimate purchaser of any one parcel as his or her client.

5. Machan did not allege or point to any evidence that Polcha's oral agreement with Goddard included a provision that the latter's mere receipt and logging of a client registration letter, with no affirmative response, would constitute Western's acceptance of whatever contractual terms that letter contained, including any client or clients identified therein.

sale of IOmega Park to CapCorp had fallen through and that the property was back on the market, suggesting he contact his clients and see if they still had any interest in the property. Polcha conveyed the information in a telephone call to Trachman, who said he would get back to him about it, but did not.

On August 7, 1985, Polcha sent the following letter to Goddard:

RE: REGISTRATION OF CLIENT FOR PROPERTIES KNOWN AS IOMEGA LIGHT INDUSTRIAL PARK

Dear Mr. Goddard:

Machan Hampshire Properties, Ltd./Robert F. Polcha represents the following client in connection with the proposed purchase of the above mentioned properties:

THE ESTATE OF JAMES CAMPBELL

The purpose of this letter is to register this client with you and to set forth our understanding that in the event a sale is consummated between yourself and this client, you agree to pay a commission to Machan Hampshire Properties, Ltd./Robert F. Polcha, based on 5% of the gross selling price, paid at closing.

The preceding confirms, in full, our understanding as presented to us by you. If, for any reason, you do not agree, we will delay presenting the subject property for five (5) days from date hereon so you may respond. Thereafter, the above mentioned terms will apply.

Very truly yours,

MACHAN HAMPSHIRE PROPERTIES, LTD.

Robert F. Polcha, Director

Acquisitions and Investments

Goddard responded to the Campbell Estate letter on August 9, 1985:

Re: Registration of Client

IOmega Park

James Campbell

Dear Bob:

In response to your letter, we only have agreed to pay a 4% commission on the above park.[6] All other terms of your letter are acceptable.

Very truly yours,

/s/

Kelly Goddard

President

On September 6, 1985, Goddard responded to Machan's prior registration letters with the following letter:

*Re: IOmega Park Roy Utah*

Dear Bob:

I have been receiving your letters of registration of clients. Though most are acceptable the following were contacted prior to receipt of your letters.

1. DeAuza Corporation
2. August Financial
3. Birtcher Properties/Cap Corp

Therefore we cannot recognize the above. Should you have any questions please contact me.

Very truly yours,

Kelly Goddard

President

On September 27, the owners of IOmega Park and Birtcher Investments entered into an agreement for the latter's purchase of the property for $7,425,000. Twelve days later, Birtcher signed a "contract for services" with First CapitalCorp, Inc., promising to pay it $500,000 as a "finder's fee" for Birtcher's purchase of IOmega Park.[7] Western refused to pay Machan a 4% commission on the sale to Birtcher, and Machan commenced this lawsuit.

In the first cause of action, which was against Western Development, Western Mortgage, and K–E Enterprises for breach of contract, Machan alleged that it and Western Development had an agreement that "in the event a transaction between

---

6. Polcha apparently never sent a written response as to whether Machan would accept a 4% commission if the property was sold to the Estate of James Campbell.

7. There is no record evidence that Birtcher authorized Machan to act as its agent in its purchase of IOmega park, and Machan has not alleged that it was involved directly in relaying Birtcher's offers in either that transaction in August or September of 1986 or the contract of services between Birtcher and First Capitalcorp, Inc., which is allegedly a CapCorp affiliate.

Birtcher and defendant Western [Development] or its principals was consummated regarding IOmega park, [Machan] would be paid a 4% commission."

The first four of the letters reprinted above, which Machan alleged set forth the agreement, were attached to the complaint. Respondents presented the fifth letter to the court in support of their motion for summary judgment. After considering the parties' cross-motions for summary judgment on Machan's first cause of action, the trial court ruled that the contract claim was barred by the statute of frauds in section 25–5–4(5). In its appeal, Machan reasserts that the statute's requirement of "some note or memorandum" of the parties' agreement is satisfied by the correspondence, quoted above, between Goddard and Polcha before Goddard's September 6 letter.

At the time, the statute provided: Certain agreements void unless written and subscribed.

In the following cases every agreement shall be void unless such agreement, or some note or memorandum thereof, is in writing subscribed by the party to be charged therewith:

. . . .

(5) Every agreement authorizing or employing an agent or broker to purchase or sell real estate for compensation.

This statute is intended to protect property owners from fraudulent and fictitious claims for commissions. *Fowler v. Taylor,* 554 P.2d 205, 208 (Utah 1976); *C.J. Realty, Inc. v. Willey,* 758 P.2d 923, 927 (Utah Ct.App.1988). It applies broadly to agreements requiring compensation for brokering real estate, including finder's agreements, and not just to contracts employing brokers to purchase or sell real estate for compensation. *C.J. Realty, Inc.,* 758 P.2d at 927. Under section 25–5–4(5), a broker must allege and prove an express written contract to recover a commission. *C.J. Realty,* 758 P.2d at 928; *see also Case v. Ralph,* 56 Utah 243, 188 P. 640, 642 (1920) (to recover commission, it must appear that broker has an "express contract or agreement of authority in which the terms and conditions of his employment, if any, and the amount of his commission, etc. are stated" and that such contract is in writing).[8]

One or more writings, not all of which are signed by the party to be charged, may be considered together as a memorandum for purposes of the statute of frauds if there is a nexus between them. *See Gregerson v. Jensen,* 617 P.2d 369, 373 (Utah 1980). The nexus requirement is satisfied either by express reference in the signed writing to the unsigned one, or by implied reference gleaned from the contents of the writings and the circumstances surrounding the transaction. *Id.* Regardless of whether a memorandum is made up of one or more writings, in order to satisfy the statute it must contain all the essential terms and provisions of the contract to which the parties have agreed. *Birdzell v. Utah Oil Refining Co.,* 121 Utah 412, 242 P.2d 578, 580 (1952); *see Ney v. Harrison,* 5 Utah 2d 217, 299 P.2d 1114, 1118 (1956) (memorandum must identify parties, subject matter, and "set out the conditions of the transaction with adequate certainty").[9] Furthermore, "the memorandum must show what the contract was, and not merely note the fact that some contract was made." *Collett v. Goodrich,* 119 Utah 662, 231 P.2d 730, 732 (1951).

In light of the purpose of the statute and the nature of the agreement that

---

8. Although application of the statute may lead to harsh results where a real estate broker's labors go uncompensated, a broker must be presumed to know that an oral contract of employment for rendition of services in negotiating a sale of real estate for a commission is invalid. *Gray v. Kohlhase,* 18 Ariz.App. 368, 502 P.2d 169, 172 (1972). A broker who fails to secure written authorization assumes the risk of relying on oral promises and has no cause to complain if efforts go unrewarded. *Pacific Southwest Dev. Corp. v. Western Pac. R.R.,* 47 Cal.2d 62, 301 P.2d 825, 831 (1956).

9. Compare the statute of frauds in Utah Code Ann. § 70A–2–201(1) (1980), applicable to contracts for the sale of goods for the price of $500 or more. Official Comment 1 to the counterpart provision in Uniform Commercial Code § 2–201(1) states that the writing required by this provision need not contain all the material terms of the contract. Instead, all that is required is that the writing be signed, evidence a contract for the sale of goods, and specify a quantity.

Machan contends existed between the parties, we conclude that the correspondence between Goddard and Polcha is insufficient to satisfy the statute of frauds in section 25–5–4(5). In reaching that conclusion, we presume, as the parties presumed in the trial court, that there is a sufficient nexus between the letters to consider them together as one memorandum because they all relate to payment by Western Development of a commission upon the sale of the IOmega Park by its owners. *See Gregerson*, 617 P.2d at 373; *see also* 2 A. Corbin, *Corbin on Contracts* § 516 at 753–54 (1950). Even when considered as such, however, the letters are an inadequate memorandum under the statute.

Like the plaintiff in *Birdzell*, 242 P.2d at 580, Machan contends that the first four letters are a memorandum of an agreement, previously reached by the parties, that Western would pay a 4% commission to Machan if IOmega Park was sold *to Birtcher*. However, the February 21 informational letter and the August 9 Campbell Estate letter, both signed by Goddard, lack any acknowledgment or recognition that the parties had theretofore entered into a commission contract relating specifically *to Birtcher*, a defect shared by the correspondence in *Birdzell*, 242 P.2d at 580. *See also Franklin v. Hansen*, 59 Cal.2d 570, 381 P.2d 386, 30 Cal.Rptr. 530 (1963) (writing offered to satisfy statute of frauds must contain the specific elements of a consummated agreement). Such an acknowledgment would lend "authenticity to the existence of the alleged oral agreement," *Birdzell*, 242 P.2d at 580. Although Goddard's August 9 letter deals generally with the same subject matter, it contains no reference to the February 26

Birtcher letter from Polcha nor any expression amounting to an admission that the purported contract set forth in Polcha's letter was ever, in fact, made. *See* 2 A. Corbin, *Corbin on Contracts* § 516 at 547 (1950); *see also id.* § 512 (writings must so clearly evidence the fact that a contract was made, and what its terms are, "that there is no serious possibility that the assertion of the contract is false").

Notwithstanding the mention of a prior "understanding" in Polcha's February 26 letter to Goddard, according to their deposition testimony the two men had not discussed Birtcher or any other specific client of Machan's when Polcha sent this registration letter naming Birtcher as his client. In light of this fact, Polcha's February 26 registration letter is clearly an offer to act as Western's broker in the sale of IOmega Park to Birtcher (and the other named clients) for an unlimited time period. Unlike some of Polcha's later registration letters, it does not invite a response indicating Western Development's acceptance or rejection of those terms.[10] That offer was not accepted by Goddard's signed August 9 letter, which is only a response to Polcha's separate written offer of August 7 to broker the IOmega Park to another ostensible client. This separate offer contained no reference to Birtcher, but did assert that the terms presented would be deemed accepted if not objected to by Western Development within five days.[11] Polcha's February offer regarding Birtcher was expressly rejected by Goddard in his letter of September 9.

Regardless of their sufficiency in a hypothetical lawsuit to enforce payment of a commission upon the sale of IOmega Park

---

**10.** Throughout this litigation, Machan has never pinpointed words or conduct, apart from the correspondence, that it claims constituted Western's acceptance of the terms set forth in Polcha's February 26 letter, although it has repeatedly referred to the parties' oral commission agreement. In its brief on appeal, Machan contends that Western's acceptance can be implied from its failure to object to the offer's terms prior to August 1985. However, even if we were to assume that Western impliedly accepted through its silence, the contract thus formed—like the express oral agreement Machan seemed to be claiming before the trial court—would nonetheless be an express con-

tract, *see* 1 A. Corbin, *Corbin on Contracts* §§ 18–19 (1950), subject to the requirements of the statute of frauds in section 25–5–4(5).

**11.** *Cf. Red Carpet–Barry & Assocs. v. Apex Assocs.*, 130 Ariz. 302, 635 P.2d 1224, 1225–26 (Ct.App.1981) (broker's client registration letter contained name of client, identified the property and the commission payable upon sale, and added: "Please acknowledge your acceptance of these terms by signing the enclosed copy of this letter and return it to our office in the enclosed self addressed envelope....").

to the Campbell Estate, the writings relied upon in the instant case do not evidence the purported agreement *vis a vis* Birtcher that Machan seeks to enforce. "It is elementary that compliance with the statute of frauds cannot be effected by producing a writing of some contract different from the contract on which the party is basing his claim." *Collett v. Goodrich*, 231 P.2d at 732.

Accordingly, the trial court correctly determined that the February letters and the August 9 letter, in which Western Development offered to pay a 4% commission to Machan if IOmega Park was sold to the Estate of James Campbell, constitute an inadequate memorandum of the alleged commission agreement between the parties pertaining to a sale to Birtcher. To hold otherwise would thwart the very intent of the statute and permit Machan to foist an enforceable contract on Western Development merely by unilaterally sending off open-ended client registration letters.

Machan also argues on appeal that the statute of frauds is inapplicable because there is deposition testimony which Machan construes as an admission by Goddard that the parties had an oral commission agreement pertaining to Birtcher. *See* 2 A. Corbin, *Corbin on Contracts* § 498 (1950 & Supp.1984). Because it appears from the record that this claim is being raised on appeal for the first time, we decline to reach its merits. *Busch Corp. v. State Farm Fire & Cas. Co.*, 743 P.2d 1217, 1219 (Utah 1987).

The judgment of the trial court is affirmed.

BILLINGS, J., concurs.

ORME, Judge (concurring):

I fully concur in the court's opinion in this perplexing case. I write separately only to offer some further observations.

Preliminarily, I reiterate the important lesson of *C.J. Realty, Inc. v. Willey*, 758 P.2d 923 (Utah Ct.App.1988): A signed writing may be a sufficient "note or memorandum" of an agreement to satisfy the Statute of Frauds, even though that "note or memorandum" may contain ambiguities that require resort to extrinsic evidence to clarify the parties' intent. Thus, in *C.J. Realty* we held that a signed memorandum of a finder's arrangement satisfied the Statute of Frauds, even though it was ambiguous concerning which particular property or properties were subject to the agreement. *Id.* at 928. The basis for our holding was that

> [t]he contract includes the critical terms of a finder's agreement: it identifies the finder, the finder's clients, the property owner who will owe a commission to the finder if a transaction is closed with any of the finder's clients, and the commission rate.

*Id.* Significantly, all of these terms were set forth in the document signed "by the party to be charged therewith." Utah Code Ann. § 25–5–4 (1989).

In this case, the pivotal "note or memorandum" signed "by the party to be charged therewith" is Goddard's letter of August 9, 1985, responding to Polcha's letter of August 7. Goddard's letter constitutes an acceptance of the terms set forth in Polcha's letter, except Polcha's proposal for a 5% commission. Taken together, these two letters constitute a sufficient "note or memorandum" of a finder's agreement, with only minimal ambiguity. The letters establish the finder, Polcha and/or Machan Hampshire Properties, Ltd.; the finder's client, the estate of James Campbell; the property owner who will owe a commission, Goddard and/or the company for whom he acted as president; and the commission rate, 4%. However, no other clients are even hinted at in these key documents and I discern no ambiguity in that regard which would permit Polcha an opportunity to prove that Birtcher was also his client. Any conceivable ambiguity concerning Birtcher's status was definitively put to rest with Goddard's letter of September 6 accepting certain unspecified clients, and creating an obvious ambiguity as to them, but unqualifiedly rejecting Birtcher.

Of course, the real problem in this case is that Polcha set about, in his various "registration" letters and otherwise, in reliance on an agreement he obviously felt he had with Goddard. It was that *initial* agreement which should have been reduced to

writing and signed by the parties. That agreement could easily have spelled out, in addition to commission rate and the like, details of the client registration process, including either a provision requiring express acceptance of claimed clients or, more likely, a provision that clients would be deemed accepted if not expressly rejected within a stated time period. Against the background of such an agreement, Polcha's assorted letters would have had greater meaning and clear legal significance, instead of being generated, as they were, in a legal vacuum, leaving Polcha without an enforceable contract as to Birtcher.

While this may seem a harsh result, it does not require our apology. The very adoption of a statute of frauds reflects the Legislature's considered judgment that, with certain kinds of very important arrangements, it is preferable to invalidate a few otherwise legitimate agreements because they were not written than to burden the system and the citizenry with claims premised on bogus, unwritten agreements.