**2019 UT App 165**

# THE UTAH COURT OF APPEALS

DAN COLEMAN AND ARETE GYMNASTICS LLC,
Appellees and Cross-appellants,

*v.*

TOM STUART, STS PROPERTIES LLC, AND TOM STUART
CONSTRUCTION INC.,
Appellants and Cross-appellees.

Opinion
No. 20180182-CA
Filed October 10, 2019

Fourth District Court, Spanish Fork Department
The Honorable Kraig Powell
The Honorable Jared Eldridge
No. 160300002

Barry N. Johnson and Joshua L. Lee, Attorneys for
Appellants and Cross-appellees

Denver C. Snuffer Jr., Steven R. Paul, and Joshua D.
Egan, Attorneys for Appellees and Cross-appellants

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES KATE APPLEBY and RYAN M. HARRIS concurred.

ORME, Judge:

¶1 Although the defendants raised the statute of frauds as a defense to plaintiff Dan Coleman's quiet title action in their answer to his complaint, at the summary judgment stage, and at trial, the trial court never addressed this important affirmative defense. Instead, following a bench trial, the court ruled that Coleman held a "financial interest" in the property at issue. We hold that the statute of frauds barred Coleman's quiet title action and accordingly reverse. In light of our resolution of the defendants' appeal, we do not address Coleman's cross-appeal.

BACKGROUND[1]

*The Coleman–Kriser Partnership*

¶2 Prior to moving to Utah, Coleman and his wife Jana were successful and well-respected gymnastics coaches in Alaska. In 2003, they brought their gymnastics team to compete in Utah and "dominated the competition." Matthew Kriser, the operator of Kid's Universe, a local gymnastics program, was impressed by the Colemans' team and introduced himself. He asked the Colemans to help him develop Kid's Universe into a higher quality program, and they agreed to come to Utah as consultants to assist Kriser in his efforts.

¶3 Within a short period of time, Kriser and the Colemans formed a partnership. Under this partnership, Kid's Universe was divided into two programs: Kid's Universe and Arete Gymnastics. Kriser primarily managed Kid's Universe, which offered various after-school programs such as cheerleading, karate, and ballroom dance. Coleman focused his energies on Arete Gymnastics, a gymnastics program aimed at producing high-level gymnasts. The partnership proved successful, and the programs quickly grew from approximately 150 to 650 participants, triggering the need for larger facilities.

¶4 In June 2004, Kriser purchased property in Lindon (the Lindon Property) on which he and Coleman constructed a building large enough to meet both programs' growing needs. Kriser borrowed approximately $1 million for the purchase of the Lindon Property and construction of the building. He and

---

1. "On appeal from a bench trial, we view the evidence in a light most favorable to the trial court's findings, and therefore recite the facts consistent with that standard." *Alvey Dev. Corp. v. Mackelprang*, 2002 UT App 220, ¶ 2, 51 P.3d 45 (quotation simplified).

his wife Debbie held title to the Lindon Property as joint tenants. Coleman was not listed on the title.

¶5 In June 2007, as compensation for Coleman's contributions to the construction of the building and development of the Arete Gymnastics program, Kriser and Coleman executed the "Kriser/Coleman Equity Agreement," in which the partners agreed to share equity in the Lindon Property in the following manner:

> If the property, building and the gym and office equipment were to be sold, the equity would be determined by taking the total sales price less all of the expenses and losses. The leftover funds would be considered "the equity", and would be split 50%, to Matt and Debbie Kriser and 50% to Dan and Jana Coleman.

The agreement also granted Dan Coleman a right of first refusal to purchase the Lindon Property if it were to be offered for sale.

¶6 Around that same time, the partners began discussing the possibility of selling the Lindon Property and constructing a new and yet larger facility at a more favorable location with better visibility. Additionally, Kriser, a builder by trade who viewed Kid's Universe more as a "labor of love" and not necessarily a serious business pursuit, began sensing changes in the real estate and construction markets and wished to reduce his financial exposure in the event the market began to soften. The partners therefore discussed the possibility of the Colemans buying out the Krisers' interest in the Lindon Property.

*The Coleman–Stuart Joint Venture*

¶7 Coleman soon found property he liked in American Fork (the American Fork Property) that was visible from the freeway and capable of supporting a building large enough to meet the growing needs of Arete Gymnastics. The real estate broker who

assisted Coleman in finding the American Fork Property recommended Tom Stuart Construction, Inc. (TSC) for the construction of the new building.

¶8      In August 2007, Coleman met with Tom Stuart, TSC's "primary decision maker," to discuss construction of the new building. Toward the end of the meeting, Stuart asked how Coleman would pay for the building. Coleman answered that he intended to use his equity in the Lindon Property, approximately $500,000, as a down payment and that he would finance the remaining balance.

¶9      After reviewing the "Kriser/Coleman Equity Agreement," Stuart noted that Coleman had a right of first refusal to the Lindon Property. This sparked discussion of Coleman and Stuart using the right of first refusal to purchase Kriser's interest in the Lindon Property. Once the new facility on the American Fork Property was completed, they would sell the Lindon Property and Coleman would transfer any equity he realized from the sale to help defray the expenses of the new building.[2] Ultimately, Stuart and Coleman would jointly own the new building through their respective business holdings, TSC and DJ Coleman Investments, LLC (DJCI). This arrangement appealed to Coleman because it meant that Arete Gymnastics could continue to operate on the Lindon Property until the new building on the American Fork Property was completed.

¶10     Coleman and Stuart reduced their arrangement to writing (the Letter of Intent) on November 14, 2007. The Letter of Intent stated:

---

2. The trial court does not articulate the evidence on which it based this finding. Because we did not discover in the record any written document to support this fact, the court presumably gleaned this information from the parties' testimony. In any event, the finding is not challenged on appeal.

It is also proposed that [TSC] and [DJCI] enter into an agreement to form [Arete Partners, LLC] to effect the construction of the new building. [Arete Partners] will become the sole owner and operator of the building. It is understood and accepted that TSC will own a 50% divided share (1/2 of the total building) of [Arete Partners] and DJCI will own an equal 50% (1/2 of the building) divided share.

¶11   Arete Partners was subsequently established as a limited liability company in March 2008 with Stuart listed as its manager. Although Coleman and Stuart intended Arete Partners to be a joint venture, the formation documents did not list Coleman as a member.

¶12   That same month, Coleman prepared the "Dan Coleman/Tom Stewart Equity Agreement" with the purpose of memorializing Coleman's understanding that he and Stuart were to be equal partners in any equity realized from the sale of the Lindon Property. The document stated, "The determination of the equity shall take into account all of the costs in the acquisition of [the Lindon Property]. Cost to come out first, then remaining equity will be split 50/50, 50% Coleman 50% Stewart." Coleman signed the document on March 30, 2008, and forwarded it to Stuart to sign. Stuart's signature does not appear on the agreement presented at trial, and the trial court held that "it is simply inconclusive whether or not Stuart signed the 'Coleman/Stuart Equity Agreement.'" Coleman believed that this agreement governed his relationship with Stuart right up until the parties initiated the current lawsuit eight years later.

¶13   Also in March 2008, Coleman executed a Real Estate Purchase Contract (REPC) that listed Coleman as the seller of the Lindon Property and Arete Partners as the buyer. Section 3 of the REPC listed the purchase price as $1,950,000 of which $1,550,000 would be funded by a loan arranged by Stuart, and Coleman was to pay the remaining $400,000.

¶14 On April 8, 2008, Coleman and Kriser signed closing documents listing them both as the sellers of the Lindon Property. The following day, the title company contacted Coleman to inform him that he was not listed as a record titleholder of the Lindon Property and that he and Kriser would have to sign additional documents removing him as a seller. Shortly thereafter, Coleman, the Krisers, and Stuart signed a document entitled "Addendum #1 Real Estate Purchase Contract" (Addendum #1). Although the text of Addendum #1 took up less than a third of a page, it made significant changes to the REPC. First, it struck most of section 3 of the REPC. The only surviving portion of section 3 then read, "Buyer shall make payment of the total Purchase Price for the Property in the following manner:" and provided no further information. Regardless, Coleman ultimately contributed a little over $400,000 toward the down payment, as originally contemplated by section 3 of the REPC.[3]

¶15 More significantly, Addendum #1 replaced Coleman with the Krisers as the sellers of the Lindon Property. And as the buyer, the document replaced Arete Partners with another of Stuart's entities, STS Properties, LLC. Stuart testified that the change to the property's buyer was necessary because Coleman did not qualify for the necessary loan and he believed STS Properties should be the record titleholder because it had

---

3. Specifically, the loaning bank required a down payment of $535,000 prior to closing, which Coleman could not pay. So that the deal could move forward, Stuart made the $535,000 payment in Coleman's stead. After Coleman received a check for his share of the equity realized from the sale of the Lindon Property, totaling $497,832.92, he signed the check over to Stuart. Stuart then wrote a check to Coleman for $95,000, which represented the amount necessary for the continued operation of Arete Gymnastics. Neither party intended to pay the other interest on their respective contributions to the down payment—neither Coleman's $402,000 nor Stuart's $133,000.

assumed the risk associated with the loan. Although Coleman did not recall reading Addendum #1 or understanding the implications of the change before signing it, he did know as early as April 2009 that STS Properties, and not Arete Partners, held exclusive title to the Lindon Property. Following closing, a warranty deed conveying the Lindon Property from the Krisers to STS Properties was recorded on April 15, 2008.

¶16   After the sale, Arete Gymnastics continued to operate in the building on the Lindon Property. The parties agreed that Arete Gymnastics would make the monthly mortgage payments and cover all other expenses associated with the property. This arrangement lasted from May 2008 until trial, late in 2017.

¶17   Before Coleman and Stuart could move forward with the second phase of their plan—to purchase the American Fork Property and construct a new building on it—the property needed to be rezoned to allow for their intended use of the land. The Letter of Intent specifically contemplated this necessity, expressing the need for "[c]oordination with the Planning commission to obtain city approval of the project." A little over a week after the sale of the Lindon Property, Coleman, Stuart, and Stuart's project manager attended a meeting of the American Fork Planning Commission in an effort to persuade the commission to rezone the property. The planning commission denied the proposed zoning change, and the parties did not appeal that decision.

¶18   With their plans for the American Fork Property frustrated, Coleman began searching for an alternative location. Between 2008 and 2015, he found approximately two properties a year that he believed would be suitable substitutes. But for one reason or another, Stuart's property manager rejected each proposed location. After failing to persuade Stuart to move on two particularly promising locations, Coleman concluded that Stuart was not going to build the new building and decided he needed to find a way to purchase STS Properties' interest in the Lindon Property.

¶19    In January 2015, Coleman discovered that he had been overpaying the monthly mortgage obligation by approximately $1,100 since 2008. Stuart's project manager acknowledged the mistake, and following further discussions, Coleman's monthly payment was reduced to the correct amount, $9,511, starting in November. Coleman continued making monthly payments in this reduced amount until trial, apparently reserving for later the question of how Coleman's overpayment of approximately $99,000 would be handled.

¶20    At the same time, around January 2015, Coleman began to explore buying out STS Properties' interest in the Lindon Property. Coleman made several offers to Stuart, but following a number of heated discussions and email exchanges, all negotiations broke down. Coleman then filed suit against Stuart, STS Properties, and TSC (collectively, Defendants) in January 2016, seeking to quiet title in the Lindon Property.[4] He alleged that he was "entitle[d] to possession of the [Lindon] Property and a determination that Stuart is not a title owner of the property, but is only a creditor or lien holder against the property." Defendants asserted the statute of frauds as an affirmative defense in their answer to Coleman's amended complaint. STS Properties also filed a provisional counterclaim for partition and sale, conditioned on a finding that "Coleman and STS are joint tenants or tenants in common of the [Lindon] Property." Several months later, STS Properties served Arete Gymnastics with a "Notice to Surrender Premises." Arete Gymnastics did not vacate the Lindon Property as demanded, and STS Properties filed an unlawful detainer action in November 2016. The two suits were consolidated into the current case.

---

4. Coleman also brought two claims for breach of contract, which the trial court dismissed following the bench trial on the ground that Coleman "failed to meet his burden of proof." The dismissal of these claims is not at issue on appeal.

*Procedural History*

¶21    Prior to trial, Defendants sought summary judgment on Coleman's quiet title claim arguing, among other things, that the statute of frauds barred the action. The trial court denied Defendants' motion, stating that Coleman's payment of over $400,000 "creates a substantial question of fact as to whether Stuart agreed that Coleman would thereafter have an ownership interest in the property." Although the court acknowledged that "no evidence currently in the record indicates that the parties contemplated that the April, 2008 transfer of title was meant to place title in Coleman's name," the court did not address Defendants' statute of frauds argument.

¶22    The trial court held a bench trial in November and December of 2017. Defendants again raised their statute-of-frauds defense in their trial brief and during trial. At the conclusion of trial, the court ruled that Coleman had prevailed on his quiet title claim and ordered as follows:

> a. Dan Coleman has a financial interest equal to $402,000 invested in the Lindon Property contemporaneously with the April 2008 closing.
>
> b. Dan Coleman/Arete Gymnastics have a financial interest equal to the total principal payments made toward the outstanding loan on the Lindon Property since May 2008.
>
> c. Dan Coleman/Arete Gymnastics have a financial interest in the Lindon Property equal to the $99,000 "overpayment."
>
> d. Upon a sale of the property Dan Coleman/Arete Gymnastics have a right, interest or claim equal to one half of the remaining equity once all of the remaining obligations pertaining to the Lindon Property are paid.

Although the trial court addressed many of Defendants' arguments in its order, it again failed to address their statute-of-frauds defense. The court also granted Defendants' counterclaim for sale and partition of the Lindon Property, but because the court had concluded that Coleman held an interest in the Lindon Property, it denied STS Properties' unlawful detainer action. Finally, the court denied each party's request for attorney fees.

¶23    Defendants appeal, and Coleman cross-appeals.

ISSUES AND STANDARDS OF REVIEW

¶24    Defendants raise several issues on appeal, but because their statute-of-frauds argument is dispositive and we reverse on that ground, we do not address Defendants' other arguments. *See State v. Maestas*, 2002 UT 123, ¶ 41, 63 P.3d 621; *Neilson v. Neilson*, 780 P.2d 1264, 1270 (Utah Ct. App. 1989). Defendants argue that Coleman's claim of title to the Lindon Property is barred by "the absence of a sufficient note, memorandum, or other instrument satisfying the statute of frauds." "The applicability of the statute of frauds is a question of law," which we review de novo. *Bennett v. Huish*, 2007 UT App 19, ¶ 9, 155 P.3d 917 (citation omitted).

¶25    In his cross-appeal, Coleman challenges the trial court's denial of his request for attorney fees incurred in successfully defending against STS Properties' unlawful detainer action. Ordinarily, "whether attorney fees are recoverable is a question of law which we review for correctness." *Golden Meadows Props., LC v. Strand*, 2010 UT App 257, ¶ 33, 241 P.3d 375 (citation omitted). But in light of our resolution of Defendants' appeal and remand of STS Properties' unlawful detainer action, *see infra* note 12, we have no occasion to reach the merits of Coleman's cross-appeal.

ANALYSIS

I. Scope of Analysis

¶26 Before we reach the merits of Defendants' statute-of-frauds argument, we pause briefly to clarify the scope of our analysis of this issue. Specifically, our inquiry is limited by the scope of the pleadings, and in this case, Coleman pleaded a claim to quiet title and did not plead any claims regarding partnerships or joint ventures. Accordingly, in this quiet title action, we limit our analysis to whether documentary evidence of Coleman's *title* interest in the Lindon Property satisfies the statute of frauds. We do not examine whether the statute was satisfied as regards any "financial interest" Coleman might have in any partnership, joint venture, or other business arrangement entered into with Defendants.[5]

---

5. Indeed, the statute of frauds almost certainly would not apply to a claim that Coleman is entitled to his investment and a share of the profits realized upon a potential partnership or joint venture with Defendants. *See Pasquin v. Pasquin*, 1999 UT App 245, ¶¶ 22–24, 988 P.2d 1 (amended opinion) (noting that this court has "previously held that an oral joint venture agreement to share in the profits of a real estate contract was not barred by the statute of frauds" and holding that "enforcement of oral partnership agreements is not barred by the statute of frauds"); *Mackintosh v. Hampshire*, 832 P.2d 1298, 1301–02 (Utah Ct. App. 1992) (stating that although the statute of frauds barred the plaintiff's prior quiet title action for enforcement of an oral agreement for interest in land owned by a partnership to which he was not a party, the statute of frauds did not bar the plaintiff's action seeking a share in the profits gained by the partnership). But for reasons discussed, *see infra* ¶ 28, the trial court exceeded the scope of Coleman's pleadings when it concluded that "the parties intended to engage in a partnership

(continued…)

¶27 Utah's quiet title statute provides that "[a] person may bring an action against another person to determine rights, interests, or claims to or in personal or real property." Utah Code Ann. § 78B-6-1301 (LexisNexis 2018). Coleman limited his action to claims of title to the Lindon Property. Specifically, he claimed that he "is entitle[d] to possession of the [Lindon] Property and a determination that Stuart is not a title owner of the property, but is only a creditor or lien holder against the property." He therefore sought "judgment quieting title to the [Lindon] Property . . . and finding that [his] title is superior and paramount to any claim of Defendant Stuart."

¶28 In ruling in Coleman's favor, the trial court did not determine that Coleman held title to the Lindon Property, but instead concluded that "the parties intended to engage in a partnership or joint venture with the purchase of the Lindon Property in April 2008" and that Coleman was therefore "an investor in the Lindon Property in the amount of $402,000 effectively giving him an ownership interest." But the court's determination that Coleman and Stuart intended to engage in a joint venture or form a partnership and that Coleman held an interest in such an endeavor is a few steps removed from the conclusion that he held title to the property. A mere financial interest in a joint venture does not equate to a title interest in real property or the type of interest that falls within the purview of the quiet title statute. *See id*. At best, Coleman's financial interest in his and Stuart's joint venture would have entitled him to a return of his investment and a share of the profits following the sale of the Lindon Property whenever STS Properties, as owner, chose to sell or, perhaps, following a petition for the equitable dissolution and division of partnership property. But Coleman's pleadings did not reflect this. Instead, he brought a claim

---

(…continued)
or joint venture with the purchase of the Lindon Property in April 2008," and granted relief accordingly.

seeking to quiet title in him (but not partition of the property[6]), asserting that STS Properties, the record titleholder of the Lindon Property, was "only a creditor or lien holder against the property."[7] Absent the defendant's express or implied consent, "a trial court's findings should fit within the framework of the petition as originally drawn, or as amended," *Lee v. Sanders*, 2002 UT App 281, ¶ 7, 55 P.3d 1127 (quotation simplified), and so we limit our statute of frauds analysis to the claim Coleman actually pleaded—a claim of *title* to the Lindon Property.[8]

---

6. In its counterclaim, STS Properties sought partition and sale of the Lindon Property, but only "[i]n the event the finder of fact determines that Coleman and STS are joint tenants or tenants in common of the [Lindon] Property."

7. It was suggested at oral argument before this court that one reason Coleman brought a quiet title action was that statutes of limitation potentially barred the more appropriate causes of action he could have pursued. Namely, Coleman knew as early as April 2009 that STS Properties held exclusive title to the Lindon Property, but he did not take legal recourse against Defendants until 2016.

8. Coleman, relying on rule 54 of the Utah Rules of Civil Procedure, argues that the trial court had the authority to "grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." *See* Utah R. Civ. P. 54(c). But the rule does not justify the trial court's decision insofar as it was based on grounds and theories that were neither tried nor raised, *see Combe v. Warren's Family Drive-Inns, Inc.*, 680 P.2d 733, 735 (Utah 1984) ("Although Rule 54(c)[] permits relief on grounds not pleaded, that rule does not go so far as to authorize the granting of relief on issues neither raised nor tried."), and which ignored the statute of frauds defense. And while Coleman asserts that "concepts of partners and equity are intertwined throughout the pleadings, pre-trial motions, testimony and

(continued…)

## II. Statute of Frauds

¶29 "Statutes of frauds are intended to bar enforcement of certain agreements that the law requires to be memorialized in writing." *Golden Meadows Props., LC v. Strand*, 2010 UT App 257, ¶ 22, 241 P.3d 375 (citation omitted). As pertains to real property, the Utah statute of frauds provides that "any contract conveying an interest in land in which the agreement has not been reduced to writing and signed by the person relinquishing the property is unenforceable." *JDW–CM, LLC v. Clark LHS, LLC*, 2014 UT App 70, ¶ 14, 323 P.3d 604. *See also* Utah Code Ann. § 25-5-1 (LexisNexis 2013); *id.* § 25-5-3. Although deeds are the preferred method of transferring interests in real property and satisfying the statute of frauds, *see Evans v. Board of County Comm'rs*, 2004 UT App 256, ¶ 9, 97 P.3d 697, "all that is required is that the interest be granted or declared by a writing subscribed by the party to be charged" and that the writing "include all the essential terms and provisions of the contract," *JDW–CM*, 2014 UT App 70, ¶ 15 (quotation simplified). And "in determining whether a document purports to convey an interest in land, the court must focus on the document to see whether it identified the grantor, the grantee, and the interest granted or a description of the boundaries in a manner sufficient to construe the instrument as a conveyance of an interest in land." *Kelly v. Hard Money Funding, Inc.*, 2004 UT App 44, ¶ 21, 87 P.3d 734 (quotation simplified).

¶30 To satisfy the statute of frauds, a plaintiff may proffer "one or more writings, not all of which are signed by the party to

---

(…continued)

evidence at trial," he does not support this contention with citations to the record. *See* Utah R. App. P. 24(a)(8) ("The argument must explain, with reasoned analysis supported by citations to legal authority and *the record*, why the party should prevail on appeal.") (emphasis added). Accordingly, we decline to delve further into this issue.

be charged, [to] be considered together as a memorandum if there is a nexus between them." *Reynolds v. Bickel*, 2013 UT 32, ¶ 17, 307 P.3d 570 (quotation simplified). "A nexus for statute of frauds purposes is indicated by express reference in the signed writing to the unsigned one, or by implied reference gleaned from the contents of the writings and the circumstances surrounding the transaction." *Id.* ¶ 18 (quotation simplified).

¶31 Coleman argues that "[t]he trial court rejected and refused to address Stuart's statute of frauds defense because the court relied on the numerous written documents (some signed by Stuart or created at his direction) to support its conclusion that Coleman had a financial interest[9] in the Lindon Property."[10] The documents to which Coleman directs our attention are the Letter of Intent, the REPC, the Buyer's Final Closing Statement, and a reference to an email between two employees of STS Properties. Having reviewed these documents, we conclude that

---

9. Coleman's argument on appeal is focused entirely on the trial court's finding that he held a "financial interest" in the Lindon Property. He does not argue whether the statute of frauds was satisfied as relates to his claims of title to the property. Our review of the record has not revealed any documentation in addition to that already proffered by Coleman that would support his claim of title to the Lindon Property. *See infra* note 11.

10. Coleman does not contend that his interest in the Lindon Property arose by operation of law, Utah Code Ann. § 25-5-1 (LexisNexis 2013), or that an exception to the statute of frauds applies, *see, e.g.*, *Coleman v. Dillman*, 624 P.2d 713, 715 (Utah 1981) (discussing the doctrine of part performance as an exception to the statute of frauds); *Golden Meadows Props., LC v. Strand*, 2010 UT App 257, ¶ 23, 241 P.3d 375 ("A party is estopped from asserting the statute of frauds as a defense only if it has expressly and unambiguously waived the right to do so.") (quotation simplified).

they do not satisfy the statute of frauds as concerns Coleman's claimed title to the Lindon Property.

¶32 Although the trial court concluded that the Letter of Intent "was still in effect at the time of the transaction and laid out a proposed road map for the parties' relationship," the document is silent as to the parties' agreement concerning title to the *Lindon* Property. Instead, the Letter of Intent is entirely focused on the purchase and construction of a building on the *American Fork* Property. The document provides that Coleman and Stuart, through their respective entities, would own an undivided 50% interest in the new building on the American Fork Property, but the Letter of Intent is entirely silent as to the parties' intent with regard to ownership of the Lindon Property. Indeed, the letter does not make any mention whatsoever of the Lindon Property. Thus, the writing does not grant or confirm Coleman's alleged title interest in the Lindon Property. *See JDW-CM*, 2014 UT App 70, ¶ 15.

¶33 In contrast, although the REPC and its corresponding amendment, Addendum #1, deal directly with the transfer of title to the Lindon Property, they do so in STS Properties' favor. The REPC listed Coleman as the seller of the Lindon Property and Arete Partners as the buyer. According to the Letter of Intent and the trial court's findings, Coleman and Stuart, through their respective entities, intended to each own a 50% interest in Arete Partners. But the REPC cannot be viewed in isolation. Addendum #1, signed by both Coleman and Stuart, amended the REPC and specified that the sole purchaser of the Lindon Property was to be STS Properties—an entity in which Coleman had no interest, intended or otherwise. Thus, although the REPC could arguably be construed to read that Coleman was in line to acquire at least an indirect title interest in the Lindon Property by virtue of his intended 50% interest in Arete Partners, Addendum #1 revokes any such possibility. By the plain terms of Addendum #1, STS Properties was to solely hold title to the property.

¶34 The Buyer's Final Closing Statement lists the Krisers and Coleman as the sellers of the Lindon Property and STS Properties as the sole buyer. Additionally, the statement provides the purchase price and a breakdown of various fees that would be incurred at the closing of the sale. Coleman argues that "the Buyer's Final Closing Statement resolved the purchase in a manner consistent with the parties' intent described in the [Letter of Intent] and the REPC." But, as discussed above, the Letter of Intent contemplates only joint title ownership of the American Fork Property and is entirely silent on the Lindon Property, and Addendum #1 unambiguously provides that STS Properties is the sole title owner of the Lindon Property.

¶35 Finally, Coleman points to an email between two employees of STS Properties. The email provided a breakdown of value of the Lindon Property around October 2015 as well as each party's distribution of the proceeds of the sale. The calculation specifically contemplated a "50/50 Split" of the equity realized on the building. The email also contemplated a return of "[Stuart's] Investment" in the amount of $133,098.85, presumably for his portion of the $535,000 down payment, and mentions a "loan" of $400,000, presumably referencing Coleman's portion of the down payment. However, the email does not establish that Coleman held a title interest in the Lindon Property, especially in light of Addendum #1. At best, this email demonstrates Coleman's interest in a share of the profits realized upon the sale of the Lindon Property as part of a joint venture with Stuart, or perhaps it goes towards establishing that Coleman is a creditor of STS Properties.[11]

---

11. For this same reason, the "Dan Coleman/Tom Stewart Equity Agreement" does not satisfy the statute of frauds as concerns title to the Lindon Property. It was unclear whether Stuart ever signed the agreement, and even assuming there is a sufficient nexus between the agreement and the documents proffered by Coleman on appeal, they would not satisfy the statute of frauds

(continued…)

¶36 Having reviewed all relevant documents, we conclude they do not satisfy the statute of frauds, and Coleman's claim of title to the Lindon Property is therefore barred.[12] To be sure, at an instinctive level there is no question that the result the trial court reached in this case comports with a basic understanding of what the parties intended and what is fair. But the "financial interest" route taken to achieve this result is a square peg that does not fit into the round hole created by Coleman's quiet title cause of action. Accordingly, affirming the just outcome reached by the trial court would necessitate a virtual repudiation of the statute of frauds. And while our decision "'may seem a harsh result, . . . [t]he very adoption of a statute of frauds reflects the Legislature's considered judgment that, with certain kinds of very important arrangements,'" such as the transfer of real property, "'it is preferable to invalidate a few otherwise legitimate agreements because they were not written than to burden the system and the citizenry with claims premised on bogus, unwritten agreements.'" *Wardley Corp. Better Homes & Gardens v. Burgess*, 810 P.2d 476, 478 (Utah Ct. App. 1991) (quoting *Machan Hampshire Props., Inc. v. Western Real Estate & Dev. Co.*, 779 P.2d 230, 237 (Utah Ct. App. 1989) (Orme, J., concurring)).

---

(…continued)
when viewed together as a memorandum. *See Reynolds v. Bickel*, 2013 UT 32, ¶¶ 17–18, 307 P.3d 570.

12. Because the trial court dismissed STS Properties' unlawful detainer action on the ground that "Coleman/Arete Gymnastics have an ownership interest in the Lindon Property," we also reverse the dismissal of that action and remand for the court's consideration of any additional defenses that Coleman may have raised in opposing the unlawful detainer action.

### III. Attorney Fees

¶37 Coleman cross-appeals the trial court's denial of his request for attorney fees incurred in successfully defending against STS Properties' unlawful detainer action. "In Utah, attorney fees are awardable only if authorized by statute or contract." *Veracity Networks LLC v. MCG S. LLC*, 2019 UT App 53, ¶ 15, 440 P.3d 906 (citation omitted). Coleman asserts that he is entitled to attorney fees under Utah's bad faith statute, which directs trial courts to "award reasonable attorney fees to a prevailing party if the court determines that the action or defense to the action was without merit and not brought or asserted in good faith." Utah Code Ann. § 78B-5-825(1) (LexisNexis 2018). But given our remand of STS Properties' unlawful detainer action, *see supra* note 12, it remains to be determined whether STS Properties' action was (1) "without merit" and, if so, (2) "not brought or asserted in good faith."[13] *Id.* Accordingly, we have no occasion to reach Coleman's cross-appeal.

### CONCLUSION

¶38 We conclude that Coleman's action seeking to quiet title to the Lindon Property in his favor was barred by the statute of frauds and accordingly reverse. We remand for further proceedings in STS Properties' unlawful detainer action, as appropriate, given that the trial court's resolution of the unlawful detainer action was a product of its erroneous ruling on the quiet title claim.

---

13. In denying Coleman's request for attorney fees, the trial court did not address whether STS Properties brought its unlawful detainer action in bad faith. Instead, the court's denial of fees was limited to the statement, "In light of the facts involved in this case, the Court declines to award attorney fees to either side."